

**FILED**

AUG – 4 2011

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA   Page 2
BY _____
DEPUTY CLERK

✎AO 241
(Rev. 10/07)

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: California - Eastern |
|---|---|

| Name (under which you were convicted): Kevin Lewis | Docket or Case No.: 2:11CV2072 KJN (HC) |
|---|---|

| Place of Confinement : California State Prison, Corcoran | Prisoner No.: G-06405 |
|---|---|

| Petitioner (include the name under which you were convicted) | | Respondent (authorized person having custody of petitioner) |
|---|---|---|
| Kevin Lewis | v. | C. Gibson, Warden |

| The Attorney General of the State of California |
|---|

### PETITION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    Sacramento County Superior Court

    (b) Criminal docket or case number (if you know):   05 F 06143

2.  (a) Date of the judgment of conviction (if you know):   11/20/2007

    (b) Date of sentencing:   2/1/2008

3.  Length of sentence:   47 years detrminate consecutive to 25-life

4.  In this case, were you convicted on more than one count or of more than one crime?   ☑ Yes   ☐ No

5.  Identify all crimes of which you were convicted and sentenced in this case:

    Kidnapping, robbery, forcible rape in concert (6 counts), forcible oral copulation in concert

6.  (a) What was your plea? (Check one)

    ☑ (1)   Not guilty          ☐ (3)   Nolo contendere (no contest)

    ☐ (2)   Guilty             ☐ (4)   Insanity plea

✎AO 241
(Rev. 10/07)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

(c) If you went to trial, what kind of trial did you have? (Check one)

☑ Jury    ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☑ Yes    ☐ No

8. Did you appeal from the judgment of conviction?

☑ Yes    ☐ No

9. If you did appeal, answer the following:

(a) Name of court:    California Court of Appeal, Third Appellate District

(b) Docket or case number (if you know):    C058084

(c) Result:    Affirmed

(d) Date of result (if you know):    1/8/2010

(e) Citation to the case (if you know):    Unpublished

(f) Grounds raised:

Ten issues, including denial of speedy trial, failure to preserve evidence, denial of cross-examination, ineffective assistance of counsel/prosecutorial misconduct

(g) Did you seek further review by a higher state court?    ☑ Yes    ☐ No

If yes, answer the following:

(1) Name of court:    California Supreme Court

(2) Docket or case number (if you know):    S180371

(3) Result:
Review denied

(4) Date of result (if you know):    2/10/2010

(5) Citation to the case (if you know):          Unpublished

(6) Grounds raised:
    See 9(f) above

(h) Did you file a petition for certiorari in the United States Supreme Court?     ☐ Yes     ☑ No

    If yes, answer the following:

    (1) Docket or case number (if you know):

    (2) Result:

    (3) Date of result (if you know):

    (4) Citation to the case (if you know):

10.   Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions

      concerning this judgment of conviction in any state court?          ☑ Yes     ☐ No

11.   If your answer to Question 10 was "Yes," give the following information:

      (a)     (1) Name of court:     California Supreme Court

              (2) Docket or case number (if you know):     S193944

              (3) Date of filing (if you know):     6/16/2011

              (4) Nature of the proceeding:     Petition for Writ of Habeas Corpus

              (5) Grounds raised:

                   Denial of constitutional right of confrontation when nurse Smith testified regarding the 2005
                   interview of T. L. conducted by nurse Tilden and petitioner was unable to confront and
                   cross-examine nurse Tilden who died prior to the 2008 trial.

              (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

              ☐ Yes     ☑ No

              (7) Result:     Pending

              (8) Date of result (if you know):

✎AO 241
(Rev. 10/07)

(b) If you filed any second petition, application, or motion, give the same information:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ❏   Yes    ❏  No

    (7) Result:

    (8) Date of result (if you know):

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

❏ Yes    ❏ No

(7) Result:

(8) Date of result (if you know):

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:     ❏ Yes    ❏ No

(2) Second petition:   ❏ Yes    ❏ No

(3) Third petition:     ❏ Yes    ❏ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

   CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

   Denial of constitutional right to speedy trial where petitioner was arraigned on January 4, 2006, his trial began on September 4, 2007, and he objected to all continuances.

(b) If you did not exhaust your state remedies on Ground One, explain why:

(c)    **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☑ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐   Yes    ☐   No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?    ☐ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?    ☐ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One:

**GROUND TWO:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Denial of due process where the district attorney instructed nurses interviewing alleged sexual assault victims
not to preserve any inconsistent statements by the interviewer.

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c)  **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?  ☑ Yes   ☐ No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why:

(d)  **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐  Yes   ☐  No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?                         ☐ Yes      ☐ No

(4) Did you appeal from the denial of your motion or petition?                    ☐ Yes      ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes      ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you :

have used to exhaust your state remedies on Ground Two

**GROUND THREE:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Petitioner was denied his constitutional right of confrontation
when Nurse Schmidt testified as to the contents of the report
prepared by Nurse Tilden, who was unavailable for **cross-**
examination.

AO 241
(Rev. 10/07)

Page 10

(b) If you did not exhaust your state remedies on Ground Three, explain why?
A habeas corpus petition raising this ground is pending in the California Supreme Court

(c)    **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☐ Yes    ☑ No

(2) If you did not raise this issue in your direct appeal, explain why:
Ineffective  assistance of appellate counsel

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes    ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?    ☐ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?    ☐ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three:

See (b) above

**GROUND FOUR:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Denial of constitutional right to cross-examination by trial court restriction on questioning of the alleged victim.

(b) If you did not exhaust your state remedies on Ground Four, explain why:

(c)  **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?        ☑ Yes      ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)  **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

AO 241
(Rev. 10/07)

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?              ☐ Yes     ☐ No

(4) Did you appeal from the denial of your motion or petition?          ☐ Yes     ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ☐ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:

**GROUND** Five:

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

    Denial of effective assistance of counsel by attorney's
    failure to object to prosecutorial misconduct in closing
    argument

(b) If you did not exhaust your state remedies on Ground Five explain why:

(c)    **Direct Appeal of Ground**

        (1) If you appealed from the judgment of conviction, did you raise this issue?    ☒ Yes    ☐ No

        (2) If you did not raise this issue in your direct appeal, explain why:

(d)    **Post-Conviction Proceedings**:

        (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

            ☐ Yes    ☐ No

        (2) If your answer to Question (d)(1) is "Yes," state:

        Type of motion or petition:

AO 241
(Rev. 10/07)

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?      ☐ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?     ☐ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground

13.    Please answer these additional questions about the petition you are filing:

(a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?    ☑ Yes    ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them:

(b)    Is there any ground in this petition that has not been presented in some state or federal court?  If so, ground or grounds have not been presented, and state your reasons for not presenting them:

14.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?    ☐ Yes    ☑ No

If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy of any court opinion or order, if available.

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?    ☑ Yes    ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the raised.

        See 11 above

✎AO 241
(Rev. 10/07)

16.    Give the name and address, if you know, of each attorney who represented you in the following stages of the

judgment you are challenging:

(a) At preliminary hearing:

Do not recall

(b) At arraignment and plea:

Do not recall

(c) At trial:

Do not recall

(d) At sentencing:

Do not recall

(e) On appeal:

Laura Gordon, Box 177, Escondido, CA  92033

(f) In any post-conviction proceeding:

N/A

(g) On appeal from any ruling against you in a post-conviction proceeding:

N/A

17.    Do you have any future sentence to serve after you complete the sentence for the judgment that you are

challenging?          ☐  Yes     ☑  No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:



(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the

future?          ☐  Yes     ☐  No

18.    TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain

the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C.   § 2244(d) provides in part that:

    (1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

        (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

        (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

        (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

        (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241
(Rev. 10/07)

(2)     The time during which a properly filed application for State post-conviction or other collateral review
        with respect to the pertinent judgment or claim is pending shall not be counted toward any period of
        limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:


or any other relief to which petitioner may be entitled.


_____

Signature of Attorney (if any)


I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).


Executed (signed) on _____ (date).


X _____

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

## STATEMENT OF THE CASE

Appellant, Kevin Lewis, and codefendant, Joseph Snowden, codefendant, Christopher Carr, and codefendant, Peter Douet, were jointly tried.

Douet was acquitted of all charges. CT 266. As to Carr, the jury hung and a mistrial was declared. CT 266.

Lewis and Snowden were found guilty by a jury of kidnap for rape (Count One), in violation of Penal Code section 209, subdivision (b)(1); robbery (Count Two), in violation of Penal Code section 211; forcible oral copulation in concert (Count Three), in violation of Penal Code section 288a, subdivision (d); forcible rape in concert, in violation of Penal Code sections 264.1, involving Carr on the toilet and sink (Counts Four and Five), Lewis on the floor and sink (Counts Six and Seven), and Snowden on the bed (Counts Eight and Nine). 1CT 199, 251, 259, 4CT 1156-1164.

As to Lewis, the jury found true the Penal Code section 667.61, subdivision (d)(2), allegation as to Counts Four through Nine; and the Penal Code section 667.61, subdivision (e)(1), allegation as to Count Three. 1CT 11.

As to Snowden, the jury found true the Penal Code section 667.61, subdivision (d)(2), allegation as to Counts Three, Six, Seven, Eight, and Nine; and the Penal Code section 667.61, subdivision (e)(1), allegation as to Counts Four

1

and Five. 1CT 11.

As to all counts against both defendants, the jury found not true the allegation the crimes were gang related, within the meaning of Penal Code section 186.22, subdivision (b)(1). 1CT 251.

Lewis was sentenced to the upper term of five years on Count Two, with full consecutive midterms of seven years on Counts Three, Five, Six, Seven, Eight and Nine, plus life with the possibility of parole stayed pursuant to Penal Code section 654, on Count One, plus a consecutive 25 years to life term on Count Four. The total term imposed was 47 years plus 25 years to life. 4CT 1185.

STATEMENT OF FACTS

On July 9, 2005, at approximately 1:45 a.m., after leaving a Sacramento nightclub, Brittany Sullivan and Stephanie Coleman [1/] saw Lewis, Snowden, Douet and Carr in the downtown Denny's parking lot. 1RT 264, 267; 2RT 392; 3RT 708. Sullivan was driving, and Coleman, who had an on-again/off-again romantic relationship with Lewis for the previous seven years, asked Sullivan to stop. 1RT 266; 3RT 704, 708. Another car containing girlfriends of Sullivan and Coleman also stopped. 1RT 268.

---

Coleman testified under a use immunity agreement protecting her from perjury she had committed at the preliminary hearing and for lies she had told to the police. 3RT 700-701.

2

About 30 minutes later, all three cars left the Denny's parking lot; everybody was happy and in a good mood. 1RT 267-268; 2RT 319. Carr was driving Douet's vehicle; Douet was in the front, with Lewis and Snowden in the rear. 3RT 709, 752.

The three cars cruised around for 1-1/2 to 2 hours until Sullivan's friend's car got stopped. 1RT 268; 2RT 320. Sullivan's friend did not get a ticket but decided to go home. 1RT 268; 2RT 321. Both Sullivan and Carr recalled being in Sullivan's car up to this point, then moving to the car with Lewis and the others when they stopped at the next traffic light. 1RT 270-271; 2RT 320; 7RT 1812. Coleman recalled being in the car with the guys from the moment they left the Denny's parking lot. 3RT 708.

After driving in tandem a couple blocks, Carr turned left onto Stockton Boulevard, after hearing Snowden say "Hey that's my Ho," or "There goes my Ho," or "there is that Ho" and point so Carr would pull over. 3RT 718; 7RT 1814. Carr swerved right to stop near a white female prostitute with blond hair and white six-inch heels, walking down the street. 1RT 277; 2RT 321, 422-423; 3RT 711, 718. Tamera Lounsbury had come from Fresno to work the weekend at the Stockton Boulevard and Mack Road intersection in Sacramento. 2RT 410, 412-413. Lounsbury had received a ride to Sacramento with a male friend she refused

3

to name. 2RT 599; 3RT 665.

Coleman testified that when the car pulled up, Snowden got out, and Lounsbury started to walk away. 3RT 712. Coleman said Snowden grabbed Lounsbury by her ponytail and put her in the car. 3RT 712, 714, 817.

In her statement to officers, Coleman said, before getting out, Snowden shouted something unintelligible which included the word "Ho," then got out as Lounsbury began to run, caught her, grabbed her by the hair and dragged her bac to the vehicle. 4RT 916.

At the preliminary hearing, Coleman testified Snowden grabbed Lounsbury by the arm. 3RT 817. Coleman doesn't remember if Lounsbury was struggling. 3RT 715. Coleman said Sullivan was in the vehicle behind and would have seen what occurred. 4RT 918.

Sullivan testified she saw Snowden get out of the car, run up to the woman and have a few minutes conversation with her, then re-enter the car with the woman. 1RT 273; 2RT 343. While they were talking, Sullivan got tired of sitting and waiting, pulled her car in front, and called Coleman's cell phone. 1RT 274; 2RT 343. She was on her cell not really worrying about, nor paying attention to, what was going on. 1RT 273, 275; 2RT 343.

Sullivan previously told police Snowden had grabbed Lounsbury from

4

behind in a bear hug and put her in the car. 2RT 393; 4RT 1065, 1138-1139. At trial, Sullivan clarified she was merely repeating what Coleman had told her. 2RT 344.

Lounsbury testified she was working as a prostitute on July 8, 2005 and July 9, 2005 at the intersection of Stockton and Mack. 2RT 412-413. There was a known stroll area for prostitutes, and Lounsbury had 21 prior misdemeanor convictions for prostitution in California from 1993 to 2005 and an unknown number in other states including Arizona, Oregon, Florida and Nevada. [2] 2RT 412, 555-556; 3RT 711.

Lounsbury had smoked marijuana and had a couple drinks of Hennessey before going out to work; she had consumed methamphetamine the previous night. 2RT 414-415. Lounsbury first indicated she had had one john prior to this encounter and had earned $120. 2RT 531. She later indicated it was possibly three to four johns. 2RT 533.

Lounsbury was on the sidewalk when a car pulled up and stopped suddenly. 2RT 417-418. She was startled because she saw the car contained four black men. 2RT 437. She initially described the car as old and multi-colored. 2 RT 418-419.

---

2.      Lounsbury testified under a use immunity agreement protecting her from prosecution of a 2004 California prostitution case. 2RT 412.

5

She then said it was gray primer-colored. 2RT 420. In her preliminary hearing testimony, she said the car was burgundy. 2RT 421. During cross-examination, Lounsbury claimed she actually did not have a chance to accurately observe the car at that time. 3RT 649.

Lounsbury testified that when Snowden exited the car, she did not run; she couldn't even try because she was wearing six-inch heels. 2RT 422-423. Lounsbury told Detective Turnbull she tried to run but was grabbed. 5RT 1445. Lounsbury initially said she was forced into the car at gunpoint by four black men. 2RT 418, 576; 3RT 630. She then recanted, first saying it "could have been" at gunpoint, then saying she didn't remember there being a gun, but she "got it" by somebody's hand. 2RT 418; 3RT 630. She ultimately admitted she "was tripping," i.e., "confused," and there was never a gun involved. 2RT 577; 3RT 630-631.

Lounsbury testified she was picked up in a bear hug from the side and tossed into the backseat of the car. 2RT 423. She initially testified she though Douet helped push her in, then acknowledged she may have identified someone else at the preliminary hearing, and that she doesn't really remember the individual faces. 2RT 424.

At trial she testified the other individual probably only assisted by opening

6

the car door. 32RT 425. After reviewing her preliminary hearing testimony, she testified she just remembers two people grabbing her and pulling and pushing her into the car. 2RT 426.

According to Coleman, when Lounsbury entered the car, no one restrained her, no one struck her and no one exhibited a weapon. 3RT 853; 4RT 940. Lounsbury did not complain or protest and was not struggling. 3RT 844-845. Likewise, Carr did not hear Lounsbury shouting or saying anything. 7RT 1880.

According to Lounsbury, once she was in the car, Snowden punched her a couple times and called her a "bitch." 2RT 427. Lounsbury specified Snowden struck her with a closed fist, then upon reviewing her testimony during the preliminary examination, said she was actually slapped. 2RT 427-428. On cross-examination, Lounsbury reaffirmed she was hit with an open hand, not a closed fist, when she got in the car. 2RT 527.

Lounsbury initially testified a blindfold was put over her eyes. 2RT 442. On cross-examination and to officers, Lounsbury said a hand was used to cover her eyes. 2RT 527, 633; 5RT 1447. Coleman said Snowden told Lounsbury to be quiet and close her eyes, but no one did anything to cover them. 3RT 721-722; 4RT 917, 941.

Carr drove away immediately, and was going about 20 miles over the speed

7

limit. 2RT 433; 3RT 719. While they were driving, Snowden reached into
Lounsbury's bra and grabbed her money. 2RT 428, 430; 3RT 721. Lounsbury
testified she had roughly $120 to $140, the typical amount she receives from one
customer. 2RT 429-430. On cross-examination, she testified she had roughly
$200 that night. 3RT 660. At the preliminary hearing, she testified she had
roughly $120 kept in her bra. 3RT 661.

Lounsbury was seated between Coleman and Snowden with Lewis to
Coleman's left. 2RT 444. Coleman and Lewis were hugging and joking, and
Coleman was "giggly." 2RT 444-445, 569.

According to Coleman, Lounsbury was not crying out, complaining,
protesting or struggling in the car. 3RT 823, 846.

According to Lounsbury, she might have tried to talk to Coleman, and
pleaded with all of them to let her go. 2RT 445. Lounsbury recalled Snowden
threatening to beat her and take her to Reno to prostitute for him. 2RT 443.
Coleman heard Lounsbury say she had come from Fresno and that her pimp had a
gold car. 3RT 854, 856. Lounsbury admitted stating she had kids in Fresno, but
denied telling them her pimp had a gold car. 2RT 596.

While they were driving, Coleman called Sullivan and said she wanted out;
Sullivan told Coleman to tell Carr to pull over so she could pick her up. 2RT 394.

8

Coleman said they wouldn't let her out; the conversation ended, and Sullivan lost sight of the vehicle. 2RT 394.

After 15-20 minutes, they arrived at the Quality Inn in Rancho Cordova. 2RT 445-446. Coleman testified she exited the car at the same time as Lounsbury. 3RT 787. No one was holding Lounsbury; her mouth was not covered, and she was not blindfolded or gagged. 3RT 787-789. Walking to the hotel room, Lounsbury did not yell for help. 3RT 787-788.

Carr testified he believed Lounsbury worked for Snowden and asked if he could buy sex from her. 6RT 1771. Carr said Snowden asked for $100, but Carr agreed to pay $50. 6RT 1771. Carr gave Snowden the money in the parking lot. 7RT 1827.

Lounsbury testified Snowden took her out of the car and, with his hands over her eyes, walked her to a building where they got into an elevator. 2RT 446-447; 3RT 784. She said the same during her interview with police immediately following the incident. 5RT 1446. At the preliminary hearing, Lounsbury testified her eyes were covered from the moment she left the vehicle until she entered the elevator. 3RT 648.

However, Lounsbury also testified at trial that this was when she had an opportunity to fully observe the vehicle. 2RT 532; 3RT 648. According to

9

Lounsbury, she saw all around the car and noted it was about eight different colors. 2RT 532. In her statement to officers, Lounsbury said the car had different colors – burgundy and blue – and it was an "old school" kind of car. 4RT 1084.

In her preliminary hearing testimony, Lounsbury said she went up the elevator with Snowden and Lewis, but also said she didn't remember. 3RT 649-650. Lounsbury could not explain why she said Lewis was in the elevator when she didn't remember. 3RT 651.

After Sullivan had lost sight of the vehicle she stopped to use a restroom, got back in the car, and called Coleman to ask where they were. 1RT 276, 297; 2RT 394; 4RT 1065. Coleman told Sullivan they were now in room 425 of the Quality Inn in Rancho Cordova, and Sullivan drove to meet them. 1RT 276, 278; 2RT 395, 445-446; 4RT 1065-1066.

The hotel room was a suite with two rooms. 2RT 306.

Upon entering the hotel room, Lounsbury said Douet ordered her into the closet and told her to sit on the luggage rack. 2RT 447, 458, 460. Coleman did not recall Snowden, Lewis or Carr talking to the girl, but thinks Douet was screaming at her to get in the closet and take off her clothes. 3RT 734. Detective McBeth-Childs testified she believed Coleman told her it was Carr that told Lounsbury to get in the closet. 4RT 1105.

10

The men asked Lounsbury the identity of her pimp, and asked if he would give them money if they let her go. 2RT 451. Lounsbury said he would. 2RT 451. At trial, Lounsbury claimed she did not really have a pimp and had not had one for 10-12 years. 2RT 452. At that time, Lounsbury recalled addressing Carr, Snowden, Lewis, and Coleman, but not Douet who she believed had already left. 2RT 449, 453.

Coleman is sure Lounsbury talked about her pimp. 3RT 885. In the car, Coleman heard Lounsbury say her pimp was staying at the Motel 6 on Stockton Boulevard. 3RT 838. McBeth-Childs does not recall asking Lounsbury about a pimp nor did she initially recall Coleman saying Lounsbury talked about a pimp. 4RT 1122-1124. However, in reviewing her interview with Coleman, McBeth-Childs confirmed Coleman did inform her Lounsbury had said she had a pimp at the Motel 6. 4RT 1128.

Sullivan testified that when she arrived, Coleman was in the room along with some of the others, but neither Douet nor Lounsbury were present. 4RT 1066. Sullivan stayed in the front room by the door. 2RT 306.

According to Coleman, Sullivan never entered the hotel room; rather Coleman left alone and met Sullivan down in the parking lot. 4RT 925-926.

While in the hotel room, Sullivan did not hear cries or sounds of a woman's

11

voice. 2RT 407. Likewise, Coleman did not hear Lounsbury complain or ask to leave the hotel room. 3RT 847. Nothing in Lounsbury's demeanor appeared afraid. 3RT 847.

Sullivan did not see drug use. 2RT 307. Coleman initially denied anyone did drugs in the room. 3RT 831. However, at trial she testified the others, including Lewis, were doing cocaine. 3RT 733, 832. Coleman said she left with Sullivan because she did not like being around Lewis when he was doing drugs nor the fact there was a prostitute present. 3RT 732, 853. Carr testified some of the people in the room were smoking marijuana. 6RT 1771. Douet testified he was smoking marijuana in the room for a short while then called for a ride home. 7RT 1920-1921.

Sullivan said she stayed for a few minutes, and about 3:00 a.m., decided she was tired and left with Coleman. 2RT 306, 395. Sullivan was not aware of Coleman's concern about drug use in the room. 2RT 306. Coleman and Sullivan went home and went to bed. 3RT 735.

Lounsbury was told to stand in a corner of the closet then strip naked. 2RT 455. When she asked why, a light-skinned male with braids said "shut up bitch" and slapped her across the face. 2RT 546; 5RT 1447. Lounsbury described the driver, i.e., Carr, as a light-skinned male with braids. 6RT 1522.

Lounsbury said Lewis grabbed her and made her take off her stockings. 2RT 455-456. However, she later said no one forced her to take her clothes off. 3RT 651.

According to Lounsbury, after sitting on the luggage rack, Lewis pulled her into the bathroom, slapped her on the right side of her face, and made her sit down. 2RT 457-458, 471. After reviewing her preliminary testimony, Lounsbury said it was actually Carr that took her into the bathroom. 2RT 456.

Carr testified he was the one who took Lounsbury into the bathroom. 6RT 1772. Inside, Lounsbury gave Carr a condom. 7RT 1877. Carr said Lounsbury did not resist in any way; he never forced her to do anything – he asked her and she did it. 6RT 1772; 7RT 1871.

Lounsbury testified she initially sat on the toilet and performed oral copulation on Carr while he stood in front of her for 15-20 minutes, then Carr made her lie down on the floor and have sex with him. 2RT 475. They changed positions a number of times including doggy style while Lounsbury held the toilet. 2RT 476-478. They moved to the bathroom counter right before Lewis came in. 2RT 478. Carr wore a condom, and Lounsbury does not know if he ejaculated. 2RT 475, 478. Lounsbury was in the bathroom with Carr for about an hour. 2RT 478. According to Carr, Lounsbury never asked him to stop. 6RT 1781.

When asked why, during the preliminary examination, Lounsbury had said Carr penetrated her only one time, while at trial she claimed it was five or six times, Lounsbury said she was just giving an estimate. 2RT 526.

When done, Carr threw the condom on the ground, washed his hands, let everyone know he was leaving, and headed home because he had to work in the morning. 6RT 1772.

Lewis followed Carr and said, "let's just do what we got to do. We're going to let you go." 2RT 479. Lewis was more considerate than the others even though he had slapped her earlier. 2RT 479. Lewis touched her breasts with both hands while the sex was taking place. 2RT 479-480. He did not use a condom. 2RT 479. He initially penetrated her on the sink counter, then had Lounsbury lay on the floor on her back with her head by the toilet. 2RT 480, 482. Lewis did not make Lounsbury perform oral sex. 2RT 480. Lounsbury estimated she was with Lewis about one hour; he stopped after ejaculating and exited. 2RT 483.

Coleman said Lewis called her 30 to 60 minutes after she had arrived home and asked her to return so they could be together. 3RT 735-736. Sullivan dropped Coleman off and left. 3RT 736. Coleman met Lewis in Room 423; they had sex, then went to sleep. 3RT 737.

Lounsbury said Snowden was the last to rape her. 2RT 487. He was the

14

roughest and the only one who used physical force. 2RT 536. Lounsbury told

McBeth-Childs that Snowden slapped her twice in the face at the motel room.

3RT 635; 4RT 1090. Snowden instructed her to come out of the bathroom, and

she performed oral copulation on Snowden several times, beside and on the bed.

2RT 488. Snowden did not use a condom during oral sex, but did for intercourse.

2RT 488. Lounsbury lay on her back while Snowden was on top; they also did it

doggy style. 2RT 489-491. Snowden stopped after ejaculating in Lounsbury's

mouth, told Lounsbury to sit there, then went to the other part of the hotel suite

and fell asleep on the sofa. 2RT 490-491; 3RT 602; 5RT 1448. After 20 to 30

minutes, Lounsbury snuck out of the room and went down to the lobby. 2RT 491-

492; 5RT 1450.

Lounsbury said at one point, she tried to call the police from the hotel room

telephone, but said the phone didn't work, then later observed the telephone itself

had been removed. 2RT 492; 5RT 1449. A telephone is present in a police

photograph taken of the hotel room, but Lounsbury said it was gone when she

tried to call. 2RT 516. During her preliminary hearing testimony, Lounsbury said

the telephone did not work and the cord had been cut. 2RT 573-574. On cross-

examination, Lounsbury said she didn't remember anything about the phone in the

room, and didn't remember her preliminary hearing testimony about picking up the

15

phone, the line being dead or the wire being cut. 3RT 653, 655-656. Lounsbury admitted testifying on direct that she said the phone had been taken, but when shown the photograph of the phone, said she believed it had been returned. 3RT 654. Lounsbury told Detective Turnbull she had tried to use the hotel phone, but it wasn't working. 5RT 1449. Turnbull did not follow up as to whether the phone was really dead or not. 5RT 1449. According to McBeth-Childs, Lounsbury never said the phone lines were cut; she said the phone by the bed did not work. 4RT 1115-1116. None of the officers attempted to get latent fingerprints from the phone to determine whether Lounsbury actually attempted to use it. 4RT 1188.

After slipping out of the room, Lounsbury went to the front desk lobby. 2RT 493; 5RT 1450.

Lounsbury approached the desk clerk, Nancy Ramirez, and told her to call the police. 2RT 358, 361. Ramirez said Lounsbury seemed agitated and very nervous, and was dressed "trashy" like a prostitute. 2RT 360, 365. Ramirez didn't think someone would have rented a room to Lounsbury, did not recall someone coming in to get the keys for Rooms 423 and 425, and was hesitant and reluctant to help at first. 2RT 360-361, 493. Lounsbury told Ramirez she had been raped in their hotel and needed someone to call 911. 2RT 493. She told Ramirez to hurry up and call the police, because the men were after her, and somebody was still up

16

there. 2RT 359. Ramirez dialed 911. 2RT 357, 494. Ramirez did not recall if

Lounsbury made a second call after the 911 call. 2RT 374.

However, Lounsbury admitted calling a male friend "Simeon" in Fresno

following the 911 call. 2RT 586; 3RT 658. At the preliminary hearing, she

feigned ignorance to avoid revealing Simeon' last name, "Grice," because she felt

it was not important for anyone to know, and she did not want to involve him in

this mess. 3RT 606, 660. At trial, Lounsbury admitted she deliberately lied about

not knowing Simeon's last name. 3RT 660.

When Lounsbury called Grice, she was in a frantic state and asked him to

call her mother so she would not have to deal with all the questions her mother

would ask. 3RT 606, 674. She does not think he actually called her mother. 3RT

658.

At one point Lounsbury testified she called Grice just to talk to him to let

him know what happened to her. 3 RT 658. At another she testified she did not

want to tell Grice what had happened because it was none of his business. 3RT

606.

Lounsbury no longer associates with Grice because she chose a different

lifestyle, deciding to stay home with her kids, and Simeon lives a fast street life

though Lounsbury does not know whether Grice has ever been arrested or

incarcerated. 2RT 586-588; 3RT 658-659.

After making these calls, Lounsbury sat in the lobby waiting for police. 2RT 379. They arrived 15 to 20 minutes after the 911 call was made. 2RT 500. Sheriff's Deputy Turnbull arrived at 6:38 a.m. 5RT 1435. Lounsbury approached the police car outside in the parking lot and gave Turnbull her statement. 2RT 500. Turnbull said he met Lounsbury in the hotel lobby. 5RT 1435. Lounsbury seemed very angry, and Turnbull noticed reddening and slight swelling on her face around her left eye and creek. 5RT 1436-1437. She was not crying but wanted to get her story out and have something done immediately. 5RT 1436. Turnbull spent two to three minutes to get the facts and determine if a crime had actually occurred. 5RT 1437. Lounsbury told Turnbull her identification and $120 was taken. 5RT 1452.

Lounsbury told police the men were in Rooms 425 and 423, but at trial admitted she did not know how she knew the room numbers. 2RT 494-495; 3RT 668. She also testified she knew they had two rooms but doesn't know how she knew. 2RT 497; 3RT 668. Lounsbury told Turnbull that after leaving the room and before police arrived, she saw Snowden leave Room 425 and go into 423. 5RT 1450.

Lounsbury testified she could see the rooms visually from the lobby. 2RT

496; 3RT 671.  According to Turnbull, both rooms can be seen from outside but not from the lobby.  5RT 1451.  Defense investigator Michele Miller testified she could not see the hotel rooms from within the hotel lobby or in the doorway.  8RT 2259, 2262-2263.

Following his brief interview of Lounsbury, Turnbull got room keys for Rooms 425 and 423, then went to the fourth floor with six or seven other officers and entered Room 425 with the key.  5RT 1437-1438.

Coleman testified she and Lewis were awakened by Snowden's knock on the door.  3RT 737.  Lewis opened the door, and Snowden went to the bathroom then came out about three minutes later in his underwear.  3RT 737-738.  The police knocked on the door shortly thereafter, and after Lewis opened the door, entered with guns drawn and arrested Coleman, Lewis and Snowden.  3RT 739-740; 4RT 909; 5RT 1438-1440.

Lounsbury identified Coleman, Snowden and Lewis from inside a patrol car in the parking lot.  2RT 501-502; 4RT 914, 945 5RT 1443.

Lounsbury was then transported to UC Davis Medical Center for an evidentiary examination.  2RT 502.  Lounsbury was interviewed by a Sexual Assault Response Team (SART) nurse at the hospital during the rape exam, but she does not remember the conversation.  2RT 541.

19

Liz Tilden, the nurse practitioner who performed the sexual assault examination on Lounsbury died before the trial began. 5RT 1361. Nurse Practitioner Leslie Schmidt worked with Tilden, had the same training and testified in her place based on Tilden's report and her knowledge of procedures. 5RT 1377.

Tilden's report stated that Tilden began interacting with Lounsbury at 4:30 a.m., and Lounsbury was discharged at approximately 12:00 noon. 5RT 1382.

In her report, Tilden described Lounsbury as "cooperative with exam, quiet." 5RT 1428. She gave no indication Lounsbury was crying or hysterical. 5RT 1429.

Lounsbury admitted engaging in consensual vaginal intercourse, but denied engaging in anal intercourse, within the previous five days, and denied oral contact the previous 24 hours. 5RT 1384. The report reflects Lounsbury told Tilden both a condom and the withdrawal method was used. 3RT 666; 5RT 1384.

The form completed by Tilden did not require documentation of when and how much prior consensual intercourse occurred; therefore, Tilden did not document when the prior consensual intercourse had occurred. 5RT 1399-1400, 1414. Nowhere does the report state Lounsbury was a prostitute. 5RT 1414.

The report indicates Lounsbury admitted consuming alcohol within the

20

previous 12 hours, but denied drug use within the previous 96 hours.  5RT 1384.

Lounsbury reported no loss of memory or consciousness, bruising on her right leg,

and soreness in the vaginal area.  5RT 1385.  Lounsbury told Tilden her whole

body was grabbed.  5RT 1387.  One of the men said, "We should shoot her,"

however, no weapons were used nor was she threatened or injured other than being

slapped on the left side of her face two times.  5RT 1386-1387.

Tilden reported tenderness and redness in Lounsbury's vaginal area and an

abrasion on the posterior fourchette.  5RT 1390-1391.  At the conclusion of the

report, Tilden failed to opine whether the exam was consistent or inconsistent with

the history.  5RT 1397.  Any findings would assume the alleged victim's honesty.

5RT 1395.

According to Schmidt, the exam findings were equally consistent with

alleged sexual assault or consensual intercourse.  5RT 1393, 1426.  Schmidt

stressed the findings were consistent, not confirmatory.  5RT 1394.

Schmidt explained that their training instructs them to assume the rape

occurred.  5RT 1412.  Procedurally, when a patient changes her answer, the

examiner will throw away the first sheet and start anew; there's no way later of

knowing if the patient changed her answer.  5RT 1408-1409.  The District

Attorney's office has asked SART nurses to follow this policy of discarding

21

documentation where an alleged victim's response has changed. 5RT 1411.

McBeth-Childs stated she did not record her interview with Lounsbury nor give Lounsbury the option of having her interview recorded. 4RT 1130, 1160. The general policy provides that sexual assault complaints are not to be recorded. 4RT 1131, 1144, 1160.

In her initial interview with police, Coleman said she was never in Douet's vehicle and only arrived at Room 423 after Sullivan dropped her off around 4:00 a.m. after Lewis had called and asked her to come. 3RT 793-794; 4RT 912-913.

After Lounsbury identified Coleman as being involved in the kidnaping during the field show up, Coleman admitted she'd been untruthful because she was afraid. 3RT 741, 792; 4RT 914-915. On direct, Coleman stated she was scared something might happen to her or her son. 3RT 741, 792. On cross, she stated she was afraid of Snowden. 4RT 914-915.

At her preliminary hearing testimony, Coleman said she saw no reason to call the police over what had occurred, it just looked like four guys picking up a prostitute. 3RT 821. When Coleman left the hotel, she did not think a crime was occurring. 3RT 870. When police later knocked on the hotel room door, Coleman had her first indication something serious had occurred. 3RT 883.

Law enforcement officials led Coleman to believe she could be in danger for

22

her decision to testify. 3RT 848, 881. Lewis never threatened Coleman; however, she was afraid at the preliminary hearing because she had heard Carr had a violent criminal history, had hit his girlfriends, and been violent toward females. 3RT 849, 860. Coleman admitted she does not know Carr's girlfriends and had never seen him violent. 3RT 875-876. Nothing was hostile in Coleman's visits with Lewis prior to McBeth-Childs advising her against visiting. 3RT 897.

An analysis of Lounsbury's urine sample by Criminalist Michael Toms, revealed the presence of methamphetamine and marijuana. 6RT 1732, 1735. Her blood sample did not contain alcohol. 6RT 1733.

~~Lounsbury lied at the preliminary hearing about her prior drug use. 2RT~~ 589. She also lied about drug use on July 8, 2005. 3RT 693. She consciously ~~decided to lie to the prosecution because she decided it wasn't important to the~~ rape. 2RT 590, 693. She ultimately only told the truth because she was made ~~aware of the blood test results proving her drug use. 2RT 591.~~

McBeth-Childs asked Lounsbury about her drug use but did not include it in ~~her report. 4RT 1124-1125. Lounsbury disclosed her marijuana and~~ methamphetamine use to McBeth-Childs before testifying at the preliminary ~~hearing in December, 2005. 4RT 1126. However, McBeth-Childs said she did not~~ document Lounsbury's statements because the toxicology report showed drugs in ~~Lounsbury's system. 4RT 1146, 1150. According to McBeth-Childs, since the~~ toxicology report showed Lounsbury lied, McBeth-Childs saw no reason to further document the lying. 4RT 1157.

23

Following the preliminary hearing, McBeth-Childs brought Lounsbury to the train station and gave her presents for her children on behalf of the Sheriff's Department.  4RT 1147-1148.

Lounsbury denied knowing a pimp named Finess and denied knowing pimp rules.  3RT 680-681.  She denied talking much with fellow prostitutes over her many years in the profession.  3RT 690-692.

At trial, Lounsbury testified Snowden used the term "pimp arrest" that night but Lounsbury claimed she doesn't really know what it means.  2RT 596. Lounsbury never brought up the term "pimp arrest" before trial even though at the preliminary hearing she was repeatedly asked about pimps.  3RT 636.  Lounsbury said she understood the term "out of pocket" to mean talking to a prospective new pimp when you already have one.  3RT 696.  Lounsbury did not say she heard the term that night.  3RT 696.

Lounsbury denied ever having jokingly threatened to make false claims against johns or undercover johns or having made threats to kill them.  3RT 684-685.

Lounsbury's tattoos include the word "C Daddy" on her right leg and "Chatoe" on her right upper arm referring to her children's father as well as "Dizzy" on her left thigh referring to herself.  2RT 588-589.

Lounsbury laughed at trial when she was asked about her immunity agreement and whether she understands what perjury is.  3RT 611.  Lounsbury admitted she swore to tell the truth at the preliminary hearing then lied about her methamphetamine use.  3RT 612-614, 616.  Lounsbury also admitted falsely testifying she had never had a pimp.  3RT 616-617.  Lounsbury subsequently claimed that wasn't a lie, just something she did not want to disclose.  3RT 617.

Lounsbury admitted falsely denying her previous marijuana use within the prior 96 hours to the SART nurse in the evidentiary exam. 3RT 628. Lounsbury admitted multiple lies throughout her testimony. 3RT 624-625, 628. Lounsbury felt she could decide what was relevant and what should be disclosed because she was the one reporting a rape. 3RT 621, 628-629. Lounsbury did not feel truthfulness about her drug use was necessary. 3RT 629.

Part of Lounsbury's prostitution history included being put on probation with a prohibition of committing more acts of prostitution. 3RT 672. She repeatedly ignored those conditions, missed court appearances, and had warrants issue. 3RT 672. A pending warrant was cleared for Lounsbury's participation in this case. 3RT 672. Detective McBeth-Childs accompanied her to do it. 3RT 672. Lounsbury was also provided a hotel room and $12 per day for food in exchange for her testimony in this case. 3RT 673.

Lewis had $40 at the time of his arrest. 4RT 1041. In a post-arrest interview, Lewis told officers his friend "Gen" works at the hotel and permits him to rent rooms for a low price. 4RT 956. Lewis denied being in Room 425, and stated his DNA would not be found there. 4RT 965-966.

Lewis denied being with or even talking to a prostitute, sexually assaulting anyone or having knowledge of a sexual assault. 4RT 958, 963-966. Lewis denied being with Snowden that night. 4RT 962.

However, Lewis's finger and palm print were found in the bathroom of Room 425. 5 RT 1211, 1226-1227.

Snowden had $55 at the time of his arrest. 5RT 1441. In his post-arrest interview, Snowden denied being in Room 425 the previous night but said there was a possibility they would find his DNA because he might have been in that

room a couple days earlier. 4RT 1038-1039. Snowden denied ever being with or picking up a prostitute,. 4RT 1038.

A vaginal swab with sperm contained Lounsbury's DNA plus a male profile matching Lewis's. 5RT 1296. Lewis was also a possible contributor of sperm found on Lounsbury's right breast. 5RT 1301. Saliva found on the right breast was determined to have at least three contributors including Lounsbury and Snowden, and excluding Carr, Douet and Lewis. 5RT 1325. Saliva found on the left breast was determined to have at least three contributors including Lounsbury and Snowden, and excluding Carr, Douet, Coleman and Lewis. 5RT 1326.

A swab from a condom found at the scene showed sperm with a DNA profile matching that of Carr on the inside. 5RT 1305. A swab from the outside of the same condom contained DNA matching that of both Carr and Lewis. 5RT 1306.

According to Carr, since he's been in jail, Lewis told him he had sex with Lounsbury before Carr did which explains Lewis's semen on the condom Carr wore. 7RT 1895.

Another condom found at the scene contained no DNA. 5RT 1349. A third condom contained only one sperm head which was insufficient to test. 5RT 1350.

Analysis of Lewis's and Snowden's blood samples revealed Ecstasy, cocaine, and marijuana. 6RT 1738, 1741.

The court found Turnbull qualified to testify as a gang expert. 5RT 1461. Turnbull opined each of the defendants was a member of the East side Piru, a division of the Bloods. 5RT 1470, 1479 [Carr], 1492 [Douet], 5RT 1495 [Lewis]; 6RT 1505 [Snowden].

Turnbull opined the primary activities of the gang are narcotics sales,

assaults, assaults with deadly weapons, robberies, carjackings, burglaries, terrorist threats, and violent crimes.  5RT 1473.  Pimping is not on the list of qualifying gang crimes.  6RT 1669-1670.

In order to substantiate his opinions Turnbull testified that Lewis uses the moniker "Flip" or "Flip Ru" and that on March 9, 2003, Lewis was investigated for rock cocaine sales; on August 4, 2003, Lewis was investigated for a stolen automobile; on September 10, 2003, Lewis was investigated for a battery with serious bodily injury while in the company of Trumaine Robinson, and on March 26, 2004, Lewis was investigated for involvement in a robbery.  5RT 1498-1499.

Snowden was investigated for a string of residential robberies in February, 1999, for strong-armed robbery on October 19, 2001 and for a stolen automobile on May 15, 2003.  6RT 1503-1504.

Mark Harrison testified as an expert for the defense.  8RT 2133.  According to Harrison, rape is not a crime which benefits a criminal street gang, and there is nothing in this case to indicate any benefit to the East Side Piru gang.  8RT 2158. A prostitute who does not present her pimp with money will have to explain why, and she will often claim she was robbed.  8RT 2160.

## GROUND ONE

## PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL

**A.    The Facts**

Petitioner was arrested on July 9, 2005.  The case was originally set for trial on March 3, 2006, but was continued numerous times.  His trial did not begin until September 4, 2007.  The reasons for the continuances were the sickness of one attorney for a codefendant and the trial schedules of that attorney, his replacement, and counsel for other defendants.  Exhibit 1 at 7.  Petitioner opposed each continuance and refused to waive his right to a speedy trial.  Id., at 8.  On three separate occasions, the trial court suggested a severance to allow petitioner and one other codefendant a speedy trial; on each occasion, the prosecution refused to sever defendants for trial.  Aug. CT 211, 186, 198-201.

Petitioner filed a motion to dismiss on the grounds of a speedy trial violation, which was denied.  RT 2486.

**B.    The Law**

The Sixth Amendment guarantees a criminal defendant a speedy and public trial.  That provision "places the primary burden on the courts and the prosecutors to assure that cases are brought to trial." Barker v. Wingo (1972) 407 U.S. 514,

1

529.  Under well-established Supreme Court precedent, when a defendant claims a

speedy trial violation, four factors must be evaluated: "whether the delay was

uncommonly long, whether the government or the criminal defendant is more to

blame for the delay, whether, in due course, the defendant asserted his right to a

speedy trial, and whether he suffered prejudice as the delay's result." Doggett v.

United States (1992) 505 U.S. 647, 651.

     1.    **The length of the delay.**  The Supreme Court has held that a

defendant must show that his case was not prosecuted with customary promptness

and that the length of the delay was sufficiently presumptively prejudicial to

trigger the speedy trial analysis.  Doggett, 505 U.S.  at 652.  The Court  recognized

a delay approaching one year as sufficient to trigger the analysis, and has stated

that the extent to which the delay in a given case exceeds that time period is a

"significant" factor, because "the presumption that pretrial delay has prejudiced

the accused intensifies over time."  Id., at 652 and fn. 1.  The delay is measured

from the day of arrest, if it is earlier than the formal indictment.  Dillingham v.

United States (1975) 423 U.S. 64.

     In the present case, the delay from arrest on July 9, 2005 until

commencement of trial on September 4, 2007, was 26 months, more than twice the

triggering one year.  Measuring from the date of arraignment, the state appellate

court describes the delay as "a year and one-half." Exhibit 1 at 7, 10. Since the

actual time between arraignment on January 4, 2006 until trial began on

September 4, 2007 is 20 months, that is clearly "an unreasonable determination of

the facts in light of the evidence presented in state court proceedings" (28 U.S.C.

sec. 2254(d)(2)). More importantly, the state court erred in measuring the delay

from arraignment, rather than the earlier arrest.

**2.**     <u>**The reasons for the delay**</u>

The continuances were attributable to the illness of an attorney for one

codefendant and the trial schedules of that attorney, his replacement and other

attorneys for codefendants. The prosecution did not request a continuance, but it

also refused to sever defendants to allow petitioner, who stood ready, to go to trial

in a timely manner.

**3.**     <u>**The defendant's assertion of his speedy trial right**</u>

As the state appellate court found, "Lewis repeatedly asserted his right to a

speedy trial and refused to enter time waivers." Exhibit 1 at 8.

**4.**     <u>**Prejudice to the defendant**</u>

The state appellate court found no prejudice to petitioner and actually held

that petitioner benefitted from the delay because "T.L.'s inconsistent statements,

fading memory, and what counsel termed 'lies' all helped Lewis in closing

argument portray her as somebody whose testimony was not to be trusted."

Exhibit 1 at 9. This supposed rationale has been rejected by California's own high court [1] and turns the presumption that undue delay caused prejudice on its head, replacing it with a presumption that undue delay benefits the defendant denied his speedy trial. It is also based upon the erroneous premise that a complaining witness's "inconsistent statements, fading memory, and what counsel termed 'lies'" were the product of delay, rather than her innate lack of credibility.

In fact, the presumption of prejudice in this case was not rebutted but rather was confirmed. The Supreme Court has held that prejudice must be evaluated in light of the interests the speedy trial right was designed to protect: preventing "oppressive pretrial incarceration," reducing the accused's "anxiety and concern," and "limiting the possibility the defense will be impaired." Barker v. Wingo, supra, 407 U.S. at 532.

With respect to the first factor, the Court noted "the societal disadvantages of lengthy pretrial incarceration" and the obvious disadvantages for the individual accused  unable to obtain release: the detrimental impact of "dead time" spent in jail awaiting trial, which often leads to the loss of a job, disruption of family life,

---

1.      "[T]o contend that a faded memory aids the defendant is to assume defendant's guilt." People v. Hill (1984) 37 Cal.3d 491, 498.

4

and enforced idleness as well as the severe hindrance on his ability to gather evidence, contact witnesses, and otherwise assist in his own defense. Id., at 532-533. These factors were clearly present here where appellant spent over two years in custody prior to the start of his trial.

With respect to the second factor, appellant was undeniably subject to anxiety and concern over the prolonged incarceration. He demonstrated this every time he objected to a further continuance.

Finally, the defense was negatively impacted by the failure to enforce petitioner's speedy trial rights. First, as set forth in greater detail in Ground Two, petitioner was unable to question Nurse Tilden regarding inconsistent statements the complaining witness made during her interview with Sexual Assault Response Team (SART) member Tilden on the morning of the alleged assault. Nurse Tilden, who had died prior to the 2007 trial, was the only one who could testify to those inconsistencies, because the district attorney's policy was to insure that they were deleted from the SART report of the interview. The state appellate court dismisses this aspect of prejudice, saying that there was no evidence that the complaining witness made inconsistent statements in the case. Exhibit 1 at 10. It ill behooves the State to defend a speedy trial denial on the absence of evidence which it ordered destroyed.

5

In addition, although totally ignored by the state appellate court, the delay resulted in the loss of hotel video surveillance tapes, making it impossible for the defense to obtain exculpatory evidence demonstrating that T.L. lied about the voluntariness of her presence with the men in the car and at the hotel.

The evidence showed the hotel had surveillance cameras which would have showed the parking lot and entry activity for the hotel lobby. 2 RT 363; RT 1068. Detective McBeth-Childs obtained the video from the cameras from the hotel and began watching it on July 25, 2005 until it froze due to what she believed was a technical problem. RT 1068-1070. McBeth-Childs called the hotel to request an additional copy. RT 1069-1070. Receiving no response, she called a couple weeks later, possibly on August 11, 2005, and was referred to Swift Communications from whom she requested a copy. RT 1070-1071. Swift Communications promised to send a copy, but did not do so. RT 1071. McBeth-Childs renewed her informal request on September 5, 2005, but received no response. RT 1072, 1134. However, she never requested a subpoena for Swift Communications. RT 1112. She made no further efforts to obtain a copy of the surveillance video. 4 RT 1072. Clearly, by the time of trial over two years later, the video was no longer available.

In short, the state appellate court's denial of petitioner's speedy trial claim

6

was based upon an unreasonable fact finding and a legal error; a rationale rejected

by its own higher court and with no basis in fact; an absence of evidence caused

by the State's own policy of wilful destruction; and a refusal to consider a

demonstrated instance of prejudice.  The decision was an unreasonable application

of clearly-established Supreme Court precedent.

## GROUND TWO

### PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED BY THE STATE'S BAD FAITH IN DESTROYING EVIDENCE POTENTIALLY USEFUL TO PETITIONER'S DEFENSE

### A.   <u>The Facts</u>

Nurse Tilden, the SART nurse who performed the sexual assault

examination on T.L., died before the trial began. RT 1361.  Nurse Schmidt, who

worked with Tilden, testified in Tilden's place.  RT 1377.

Schmidt testified that as part of the SART training she and Tilden received a

training manual that stated: "If you must change an answer on your form, begin a

new page." RT 1407-1408.

Schmidt testified that, if a witness were to answer a question one way, and

then subsequently change the answer, the examiner would then discard the

original page and start a new page. RT 1408.

> "Q.    So if [T.L.] gave inconsistent answers to the questions
>        that are recorded on this document, we have no way
>        of knowing?
>
> A.    Inconsistent meaning she changed her answer?
>
> Q.    Yes.
>
> A.    That's correct.  We have no way of knowing."

RT 1408-1409.

Schmidt attempted to clarify that previously documented information would

remain intact and be transferred to the new page:

> "In other words, if you have gone down that page to question number
> 6, and the patient gives you an answer and then says, no wait a
> minute, it's this, and the examiner's already documented the first
> response, any responses prior to that change would be redocumented
> onto the new page.
>
> ". . . the intent being basically to avoid any cross-outs and
> documentation of a new answer, because when you go back
> to review these, years later, for instance, in this case, and
> you see two answers and one's crossed out, you don't know
> if the patient decided that her answer was inaccurate and
> wanted you to change it or if you had written down the
> wrong thing."  RT 1409.

Defense counsel asked Schmidt how an examiner would document a

previous answer of "yes" if the complainant had subsequently changed her

answer to "no."  RT 1410.  Schmidt responded:

8

"A.    I guess the question comes to mind, why would we
       care whether we have the previous answer or not?
       Our goal in doing these exams is to be accurate, so
       if the patient changes her answer . . . because [s]he
       feels it's more accurate to answer yes or no, we're
       told, to – it's more of a law enforcement issue
       rather than an examiner issue.

       "So our goal is to document the most accurate
       answer the patient gives us, not the issue of whether
       or not the patient changes . . . her answers. That's
       our training.

"Q.    All right. So there's a couple things her [sic]. One
       is that you would discard the first answer and then
       just  record the second answer?

"A.    Correct.

"Q.    And you also talked about, gee, we don't want to make
       the form messy. We'll just start over with a new form
       and give the second answer?

"A.    Its not a question of messy form. It's a question of
       knowing how to interpret a changed answer on a form.

"Q.    So if the witness first said yes, why would you have to
       cross it out? Why can't you just annotate later they
       said no?

"A.    That would be a question for the district attorney's
       office. This is how we've been asked to do it.

"Q.    The district attorney's office has asked you to discard
       any documentation where you change the responses?

"A.    That's correct." RT 1410-1411.

9

Schmidt explained that the SART examiner's role is not to determine whether the rape occurred but to assume that it did.  RT 1412.

"Q.   And when you have – let's just say they're the same question, answer number one is yes and answer number two is no, you're making a determination that the second answer is the correct one?

"A.   We're making a determination that the second answer is the one that the patient feels is the most accurate. That's our only goal.  We aren't here to judge, to make decisions.  We're here to document what the patient feels is most accurate as far as reporting."  RT 1410-1411.

At no time did the prosecutor ever deny or attempt to refute the fact that his office was responsible for establishing the policy requiring destruction of inconsistent statements made by sexual assault complainants.

**B.    The Law**

Under clearly established federal law, a defendant's right to due process is violated by the State's destruction of or failure to preserve evidence, in two situations: 1) where the failure to preserve or destruction was in good faith, the evidence possessed an exculpatory value that was apparent before the evidence was destroyed, and the defendant would not be able to obtain comparable evidence by other reasonably available means (see California v. Trombetta (1984) 467 U.S. 479, 488, 489); and (2)  when the failure to preserve or destruction was in bad

10

faith, and the evidence was potentially useful to the defense.  See <u>Arizona</u> v.

<u>Youngblood</u> (1988) 488 U.S. 51, 58.  In <u>Youngblood</u>, the Court described

"potentially useful evidence" as evidence "of which no more can be said than that

it could have been subjected to tests, the results of which <u>might</u> have exonerated

the defendant."  <u>Id.</u>, at 57; emphasis added.

In the present case, contrary to the state court opinion (Exhibit 1 at 15-16),

the <u>Youngblood</u> standard applies and is met.  First, the failure to preserve a record

of inconsistent statements by the complaining witness was clearly in bad faith.,

since the undisputed evidence was that the instructions to destroy any record of

inconsistent statements were given the SART nurses during their training by the

district attorney's office, because "it's more of a law enforcement issue rather than

an examiner issue."  RT 1410.  Second, a record of inconsistent statements by the

alleged victim of a sexual assault is clearly "potential useful evidence" for the

defense.  Indeed, California law specifically authorizes impeachment in the form

of proof of a prior statement by the witness that is inconsistent with the witness'

testimony at trial.  California Evidence Code section 780(h).  Under District

Attorney policy, however, SART nurses were required to destroy any evidence of

such highly probative evidence.  If a complaining witness gave an answer which

was inconsistent with an earlier answer, the nurse was to destroy the report

11

containing the first answer and start a new report containing only the second answer.

When the State has an official policy of destroying in every case all evidence of a kind which is, by its nature, potentially useful to the defense, the resulting denial of due process requires reversal.  The state appellate court decision rejecting petitioner's due process claim, erroneously made under the Trombetta standard, is  contrary to and an unreasonable application of Arizona v. Youngblood , 488 U.S. 51.

### GROUND THREE

**PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT OF CONFRONTATION WHEN NURSE SCHMIDT TESTIFIED AS TO THE CONTENTS OF THE REPORT PREPARED BY NURSE TILDEN, WHO WAS UNAVAILABLE FOR CROSS-EXAMINATION**

**A.    The Facts**

Immediately following the incident on July 9, 2005, the complaining witness was interviewed and examined by Liz Tilden, a nurse practitioner with the Sexual Assault Response Team.  RT 541.  Nurse Tilden had passed away before petitioner's trial in 2007.  RT 1361.  Another nurse practitioner, Leslie Schmidt, who had worked with Tilden, testified as to the contents of the report of the interview prepared by Tilden.  RT 1377.  Among other things, Schmidt testified

12

that Tilden reported observing tenderness and redness in T.L.'s vaginal area and an abrasion on the posterior fourcelle. RT 1390-1391. She also recounted T.L.'s statements regarding the incident.

## B.    The Law

The Sixth Amendment, made applicable to the states by the Fourteenth Amendment (Pointer v. Texas (1965) 380 U.S. 400, 401, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witness against him." The right of confrontation has been construed to include not only the right to face-to-face confrontation, but also the right to meaningful and effective cross-examination. Davis v. Alaska (1974) 415 U.S. 308, 315-316.

In Crawford v. Washington (2004) 541 U.S. 36, the Supreme Court affirmed that the Sixth Amendment guaranteed a defendant's right to confront those "who 'bear testimony against him'" and that a witness' testimony against a criminal defendant is inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. 541 U.S. at 51, 54.

Out-of-court statements are testimonial and subject to the Confrontation Clause when they "were made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a

13

later trial." Crawford, 541 U.S. at 52. In the present case, an objective witness

would reasonably believe that Nurse Tilden's statements in her report would be

available for use at a later trial.

Nurse Tilden was a member of the Sexual Assault Response Team (SART).

SART members are described on the Sacramento County District Attorney's

website as "nurse practitioners and physicians' assistants from Sutter Memorial

Hospital who are specially trained in the collection of sexual assault evidence."

SART team members follow instructions from the District Attorney's office as to

how to prepare their reports of the questioning of the alleged victim. RT 1408-

1411. Like other states, [2] California has specifically recognized that SART

personnel are part of the prosecution team. People v. Uribe, 162 Cal.App.4th

1457 (2008), 1476-1481; People v. Vargas, 178 Cal.App.4th 647, 660 (2009).

Thus, the statements of the complaining witness to Nurse Tilden were clearly

testimonial, and petitioner was denied his right of confrontation when the hearsay

statements were introduced into evidence, without Tilden available for cross-

---

2.     "SANE [Sexual Assault Nurse Examiners] . . . are trained to conduct
sexual assault examinations. A particular duty of a SANE nurse is to gather
evidence for possible criminal prosecution in cases of alleged sexual assault.
SANE nurses do not provide medical treatment.  They only examine to get vital
signs and a history from the victim." Medina v. State, 143 P.2d 471 (Nev. 2006);
accord People v. Stechly, 970 N.E.2d 333 (Ill. 2007).

examination.

The Supreme Court has ruled that, in determining prejudice from a confrontation clause violation, among the factors for the Court to consider are "the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony on material points, the extent of cross-examination otherwise permitted, and, of course,, the overall strength of the prosecutor's case." Delaware v. Van Arsdall (1986) 475 U.S. 673, 684.

In this case, Nurse Tilden's report was very important to the prosecution case, both in her physical examination of the complaining witness and the witness's statements shortly after the alleged assault. The testimony about the report was not in any way cumulative, there was no evidence corroborating it, and there was no cross-examination of the hearsay declarant. Finally, the prosecution case -- totally dependent on the testimony of a prostitute who admitted lying at the preliminary examination and at trial and who stated she felt she was the one to decide what was relevant and what should be disclosed about the incident -- was shaky at best.

The Confrontation Clause requires reversal.

15

## GROUND FOUR

## THE TRIAL COURT'S RESTRICTION ON THE IMPEACHMENT OF THE COMPLAINING WITNESS VIOLATED PETITIONER'S RIGHT TO CROSS-EXAMINATION UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

**A.**    **The Facts**

In 1995, the complaining witness made the following statement while soliciting an undercover agent for prostitution:

> "If you are lying about being an undercover officer and bust me, I'll kill you. . . .  If you bust me, I'll fill a condom with sperm and say it's yours to get you in trouble."

Exhibit 1 at 19.

The defense sought to use the statement to attack the witness's credibility. The trial court held T.L.'s threat to kill the officer if he arrested her to be relevant because "it obviously bears upon the credibility." Id., at 20.  The court held the evidence about T.L. "threatening to create a falsehood against an officer" to be relevant because "your defense in this case is that she's lying about being raped." Id., 19-20.  However, the court held the threat to manufacture evidence inadmissible because "the defense in this case is not that she planted evidence, the defense in this case is that she's lying about consent." Id., at 20.

16

When the witness testified and was asked if she had told the officer that if he was undercover she would kill him, she replied, "probably joking." RT 646. When she was asked if she threatened to make a false claim against the officer, she replied, "probably joking . . . I wouldn't call it a threat. Because if it was a threat, they would have pursued it." RT 646-647.

**B.    The Law**

The right to confront witnesses is guaranteed by the United States Constitution. U. S. Const., Sixth & Fourteenth Amends.; Pointer v. Texas (1965) 380 U.S. 400, 403 [right to cross-examine]; Davis v. Alaska (1974) 415 U.S. 308, 315 [same].

"[Cross-examination] is the principal means by which the believability of a witness and the truth of h[er] testimony is tested." Davis v. Alaska, supra, 415 U.S. at 316; Delaware v. Van Arsdall (1986) 475 U.S. 673 [preclusion of cross-examination for bias, based upon individual assessment of probative value against prejudice, as violating confrontation clause].

The state appellate court denied petitioner's constitutional claim on the following basis:

Delving into the issue of the condom, which went to her propensity to plant evidence, would have confused the issue, which here was T.L.'s propensity to

17

make a false claim of rape where the defense was consent." Exhibit 1 at 21. The decision is an unreasonable application of clearly-established federal law.

The state appellate court rationale is fatally flawed. Rather than being limited to showing that the witness was prepared to make a generic false claim against the officer, petitioner should have been allowed to show that the false claim would have been having had sexual relations with him -- and that she was prepared to manufacture evidence to back up her claim. The state court unreasonably restricted cross-examination when it limited impeachment evidence to evidence that paralleled the defense, as opposed to critical evidence that called into question the entire credibility of the witness upon whom the prosecution case rested. Under the state court's rationale that impeachment must parallel the defense offered, a witness could not be impeached with prior false statements under oath, prior criminal convictions involving dishonesty, and a host of other matters clearly admissible under federal and state law.

The state appellate court dismissed the importance of the excluded evidence on the basis that, because of the evidence admitted, the excluded evidence would not have produced a significantly different impression of the witness's credibility. Exhibit 1 at 21. To the contrary, she dismissed the threat to kill the officer as a joke because "I'm not going to kill a police officer. You know that as well as I am

18

[sic]. I don't have any murders in my jacket." RT 646. Moreover, if the jury had heard that her threat was to falsely claim sexual relations and that she was prepared to manufacture evidence to back up her claim, the witness would have had great difficulty in dismissing it as "probably joking," which she did when asked only about her threatening to make a generic, unspecified false claim.

Where "a defendant's guilt hinges largely on the testimony of a prosecution's witness, the erroneous exclusion of evidence critical to addressing the credibility of that witness violates the Constitution." DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001), citing Franklin v. Henry, 122 F.3d 1270, 1273 (9th Cir. 1997).

Here, the petitioner was denied his ability to thoroughly and adequately cross-examine T.L. as to the accuracy and reliability of her claims. Thus, the trial court's ruling violated Mr. Lewis's Sixth and Fourteenth Amendment rights.

## GROUND FIVE

### PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY HIS LAWYER'S FAILURE TO OBJECT TO PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT UNDERMINING THE BURDEN OF PROOF

A.   **The Facts**

In closing argument, counsel for defendant Snowden had likened the jury's

19

decision on a verdict to such life-altering decisions as deciding to marry, choosing

a career, buying a home, or undertaking a serious medical procedure. See Exhibit

1 at 28. In his rebuttal argument, the prosecutor stated:

> "And then Mr. Foster [Snowden's counsel] says he likens
> your decision making to marriage, career, buying a house,
> medical procedure. No. Reasonable doubt is defined to
> you. It's not – I mean those are just about as conservative
> a decision you can make in your life, you know. Who are
> you going to marry, okay? That's not your decision here.
> All right?
>
> "You're going to buy a house. You're gonna have a
> operation. Those are life altering decisions. That's not
> what you're faced with here. Don't be fooled, okay?
> We have juries up and down this state every day
> rendering guilty verdicts based on reasonable doubt
> because it's asking you to just to reason, to be reason –
> to be reasonable and logical."

RT 2461. Petitioner's counsel did not object or ask that the jury be instructed that

the prosecutor's statement misstated the law and must be disregarded.

**B.    The Law**

The prosecutor told the jurors that the reasonable doubt standard that they

were to apply was less than the standard they would use in making such

"conservative," "life-altering decisions," as to who to marry, what career to pursue,

whether to buy a home, or whether to have an operation. Instead, all that was

asked of them was to be "reasonable and logical." This type of argument is clear

20

misconduct under California law.

In <u>People</u> v. <u>Nguyen</u>, 40 Cal.App.4th 28 (1995), the prosecutor stated that the reasonable doubt standard was the same standard people customarily use every day in making important decisions such as whether to get married or, because your life is at stake, whether to change lanes when driving.  The state appellate court branded the argument as misconduct which "trivializes the reasonable doubt standard."  <u>Id.</u>, at 36.

> "We strongly disapprove of arguments suggesting the reasonable doubt standard is used in daily life to decide such questions as whether to change lanes or marry.  The argument is improper even when the prosecutor, as here, also states the standard for reasonable doubt is 'very high' and tells the jury to read the instructions."  Id.

The misconduct here was even more egregious, because rather than equating reasonable doubt with the decision whether to marry, the prosecutor told the jury that reasonable doubt was an even lower standard.

Because there was no objection to the argument, rather than deciding whether the argument was misconduct, the state appellate court turned to petitioner's argument that he was denied effective assistance of counsel by his lawyer's failure to object.  See Exhibit 1 at 30.`

A criminal defendant is guaranteed the effective assistance of counsel under

the United States Constitution. <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984).

The test for effective assistance of counsel is whether "(1) trial counsel failed to

act in the manner to be expected of reasonably competent attorneys acting as

diligent advocates and (2) it is reasonably probable that a more favorable

determination would have resulted in the absence of counsel's failings." <u>Id.</u> "A

reasonable  probability is a probability sufficient to undermine confidence in the

outcome." <u>Id.</u>, at 694.

In response to petitioner's claim on appeal that both prongs of the <u>Strickland</u>

test had been met, the Attorney General did not defend counsel's failure to object,

but argued that it was not prejudicial.  Respondent's Brief at 44.

For good reason, the Attorney General specifically did not argue that

counsel had a reasonable tactical basis for failing to object.  Nevertheless, on its

own, the state appellate court adopted that rationale as the basis for denying

petitioner's claim:

> "Although the argument was improper, we cannot say
> counsel was deficient for failing to object.  He may not
> have wanted to draw attention to the improper argument,
> knowing the court was going to instruct on reasonable
> doubt shortly and it was the instruction that controlled.
> Since we can conceive of this as a reasonable tactical
> reason for failing to object, Lewis's ineffective assistance
> of counsel claim fails."

Exhibit 1 at 30. The court's decision is an unreasonable application of <u>Strickland</u> v. <u>Washington</u>.

First, in reviewing an ineffective assistance claim, it is not the role of the reviewing court "to engage in a post hoc rationalization for an attorney's actions." <u>Brown</u> v. <u>Sternes</u>, 304 F.3d 677, 691 (9th Cir. 2000). Second, the appellate court's "post-hoc rationalization" (<u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 526 (2003) ) does not hold water. Under the circumstances of this case, no reasonably competent lawyer would have forfeited a clearly valid objection for fear of "drawing attention" to the misconduct. Instead, reasonable competent counsel would have <u>wanted to</u> draw attention to the prosecutor's statement and to have the trial court tell the jurors that it was a gross misstatement of the law and that they must totally disregard it and strictly follow the court's reasonable court instruction.

## CONCLUSION

Petitioner was denied his constitutional right to the effective assistance of counsel.

EXHIBIT 1

Filed 1/8/10  P. v. Lewis CA3

<u>NOT TO BE PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C058084 |
| Plaintiff and Respondent, | (Super. Ct. No. 05F06143) |
| v. | |
| KEVIN LEWIS et al., | |
| Defendants and Appellants. | |

A jury found defendants Kevin Lewis and Joseph Snowden guilty of kidnapping, robbery, forcible rape in concert (six counts), and forcible oral copulation in concert. The jury found not true allegations the offenses were committed on behalf of a gang. Lewis was sentenced to an indeterminate term of 25 years to life in prison and a determinate term of 47 years in prison. Snowden was sentenced to an indeterminate term of 50 years to life in prison and a determinate term of 104 years in prison.

On appeal, defendants raise contentions relating to their speedy trial rights, jury selection, evidence, prosecutorial

misconduct, jury instructions, and sentencing.  They join in each others' contentions to the extent they benefit them. Finding no merit in these contentions, we affirm the judgments.

FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of July 9, 2005, T. L. was working as a prostitute in the area of Stockton Boulevard and Mack Road in Sacramento.  She was approached by a car driven by Christopher Carr with passengers Snowden, Peter Douet, and Lewis.[1]

Snowden got out the car and came toward T. L.  She tried to run away, but Snowden grabbed her by the hair, pulled her into the backseat of the car, and slapped her a couple of times. Lewis took her purse, and Snowden reached into her bra and removed approximately $120.  A couple of them said "they were going to fuck the shit out of [her]" and added, "[t]his is Piru, Bitch."  T. L. knew "Piru" was a "Blood gang."  They drove her to a Quality Inn motel in Rancho Cordova that was about 15 to 20 minutes away.  Snowden covered her eyes "pretty much" the entire time.

When they reached the motel, Snowden kept his hands over T. L.'s eyes, and he and Lewis "put [her] in the elevator." They forced her into room 425, as they were calling each other "Blood" or "Piru."  T. L. was "pleading with them . . . to let [her] go."  Snowden and Lewis told her to take her clothes off,

---

[1]     Carr, Snowden, Douet, and Lewis were codefendants at trial. Only Snowden and Lewis are parties to this appeal.

and when she refused, Lewis "grabbed [her]," slapped her face, and made her take off her nylons.

Carr "forced [her] in the restroom," and then raped her "doggy style" while she was holding the toilet and he was behind her. He then "forced her to change positions" and get on the bathroom counter, where he "pushed his penis into her vagina." He eventually was able to ejaculate. For part of the encounter, he wore a condom.

Lewis came in the bathroom next and told T. L. "just let us do what we got to do." "He made [her] lay on the floor" and "raped [her] on her back." He then raped her on the sink. He also eventually was able to ejaculate.

Snowden then told T. L. to come out of the bathroom and into the bedroom. He "forced her initially to give him a blow job." He then made her have sex with him while she was lying on her back on the bed. He also made her have sex with him "doggy style." Eventually, he ejaculated in her mouth. For part of the encounter, he wore a condom.

By then, T. L. and Snowden were the only two left in room 425. After Snowden finished raping T. L., he fell asleep, and she sneaked out of the room.

T. L. went to the front desk and asked the motel's desk clerk Nancy Ramirez to call police because she had "just been raped." T. L. was agitated and "very nervous," and she told Ramirez to "hurry up" because they were still after her and there was "still somebody up there."

3

Sacramento County Sheriff Deputy Anthony Turnbull arrived in the motel lobby shortly thereafter.  T. L. was "very angry," and he tried to "settle her down."  She had redness and swelling around her eye and redness on her cheek.  He spoke to her and then got keys for rooms 425 and 423.

In room 425, sheriff deputies found condoms and Lewis's latent left palm print on the bathroom tub.  In room 423, they found Lewis and Snowden.

During an infield showup, T. L. identified Lewis and Snowden as two of the rapists.

Lewis told deputies he was the one who rented the rooms, but he knew nothing about a sexual assault, had not been with a prostitute that night, and did not recognize T. L.

Snowden told deputies he thought something had happened at the motel, but did not know what, and he had not been in room 425 that night.  He had not had sex that night and had never picked up a prostitute.

After the infield showups, T. L. was taken to UC Davis Medical Center for an evidentiary examination.  DNA samples taken from T. L.'s body were linked to Carr, Lewis, and Snowden. Nurse Liz Tilden from the sexual assault response team interviewed T. L.  Nurse Tilden died in February 2007, so nurse practitioner Leslie Schmidt, who was familiar with Tilden's work, testified as to the contents of Tilden's examination form regarding T. L.  T. L. was "'cooperative, with exam[,] quiet.'" T. L. admitted vaginal intercourse in the last five days but no "oral contact" within the last 24 hours.  Her vaginal area was

4

red and tender.  The examination findings were consistent with both the "alleged sexual assault" and with consensual intercourse.

According to the policy of the district attorney, nurses who conduct these sexual assault examinations are trained to begin a new page if they must change an answer on the form and discard any documentation where they had "change[d] the responses."  The intent was to "avoid any cross-outs . . . because when you go back to review these, years later . . . , and you see two answers and one's crossed out, you don't know if the patient decided that her answer was inaccurate and wanted you to change it or if you had written down the wrong thing."  The nurses "document what the patient feels is the most accurate as far as reporting."  They were not "here to judge, [or] to make decisions."  Schmidt did not know whether T. L. changed any of her answers during the interview and if she had, whether Tilden discarded the pages on which those initial answers appeared.

Deputy Turnbull was the prosecution's gang expert.  In his opinion, the current crimes were committed for the benefit of the East Side Pirus.  The crimes gave the gang "[n]otoriety" because it "g[ot] their name out there."  The crimes also gained the gang respect "through intimidation and fear and through violence."

DISCUSSION

I

*Lewis Was Not Denied His Right To A Speedy Trial*

Lewis contends he was denied his right to a speedy trial because his trial took place one and one-half years after he was arraigned. Lewis's argument fails because he was not prejudiced by the delay.

"The right to a speedy trial is a fundamental right . . . guaranteed by the state and federal Constitutions." (*Rhinehart v. Municipal Court* (1984) 35 Cal.3d 772, 776, citing Cal. Const., art. I, § 15; U.S. Const., 6th Amend.) The United States Supreme Court has set forth the following four criteria by which the right to a speedy trial is to be judged: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (*Barker v. Wingo* (1972) 407 U.S. 514, 530 [33 L.Ed.2d 101, 117] (*Barker*).)[2]

The first factor -- length of delay -- serves as a triggering mechanism. (*Barker, supra*, 407 U.S. at p. 530 [33 L.Ed.2d at p. 117].) Generally a postaccusation delay is

_____

[2]     The title of Lewis's argument asserts a deprivation of his federal and state constitutional rights to a speedy trial and his state statutory right to a speedy trial. In his argument, however, he simply recites the pertinent state constitutional provision and state statutory provisions that encompass the speedy trial right and focuses his argument on the four *Barker* factors. As he has developed no argument about his speedy trial rights under the state Constitution or California statutes, we limit our discussion to Lewis's federal speedy trial right claim.

considered "'presumptively prejudicial'" when it approaches one year. (*Doggett v. United States* (1992) 505 U.S. 647, 652, fn. 1 [120 L.Ed.2d 520, 528, fn. 1].)  Here, Lewis was arraigned on January 4, 2006, and trial began on September 4, 2007.  It was therefore a year and one-half between Lewis's arraignment on the information and his trial, so the delay necessitates "inquiry into the other factors that go into the balance."  (*Barker*, *supra*, 407 U.S. at p. 530 [33 L.Ed.2d at p. 117].)

The second factor -- reason for the delay -- requires "different weights [to] be assigned to different reasons." (*Barker*, *supra*, 407 U.S. at p. 531 [33 L.Ed.2d at p. 117].)  "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.  A more neutral reason such as negligence or overcrowded courts should be weighted less heavily . . . .  Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."  (*Ibid.*, fn. omitted.)

Here, the People did not request any continuances.  Rather, the continuances were requested by defense attorneys (other than Lewis's) for failure to complete the "DNA work," multiple ongoing trials, and the serious illness of one of the defense attorneys that necessitated bed rest.  The court noted there were "a total of eight lawyers involved in this case" and it was trying to coordinate all of those schedules.  The People's position was defendants "need[ed] to be tried jointly as a matter of convenience, the witnesses and presentation of evidence," and the victim would be caused "extreme hardship" and

7

"prejudice" to be "subjected to being on the stand twice."  In a
trial such as this one, involving numerous charges, defendants,
witnesses, and lawyers, these were valid reasons for delaying
the trial.  (*U.S. v. Vega Molina* (1st Cir. 2005) 407 F.3d 511,
532-533.)

The third factor -- the defendant's assertion of his right
-- weighs in Lewis's favor.  (*Barker*, *supra*, 407 U.S. at
pp. 531-532 [33 L.Ed.2d at pp. 117-118].)  Lewis repeatedly
asserted his right to a speedy trial and refused to enter time
waivers.

The final factor -- prejudice to the defendant -- is to be
assessed in light of the interests a speedy trial was designed
to protect:  preventing "oppressive" pretrial incarceration,
minimizing "anxiety and concern of the accused," and "limit[ing]
the possibility that the defense will be impaired."  (*Barker*,
*supra*, 407 U.S. at p. 532 [33 L.Ed.2d at p. 118].)  The last
interest is the most serious. (*Ibid.*)

Here, there is no evidence Lewis was subject to
"oppressive" pretrial incarceration or he was anxious or
concerned other than the fact he repeatedly objected to further
continuances.  Most importantly, there was no evidence Lewis's
defense was impaired by the delay in bringing this case to
trial.  None of his witnesses died or disappeared before trial
(*Barker*, *supra*, 407 U.S. at p. 532 [33 L.Ed.2d at p. 118]) and
there was no demonstrated loss of exculpatory evidence.

In attempting to demonstrate prejudice, Lewis relies
heavily on T. L.'s faded memory and the death of nurse Tilden.

8

T. L. was the *People's* main witness and claims by Lewis that she "changed her testimony from one questioner to the next and stated she did not remember the details of the night in question," do not assist his prejudice argument. Delay can work to a defendant's benefit, because "[a]s the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof." (*Barker, supra*, 407 U.S. at p. 521 [33 L.Ed.2d at pp. 111-112].) Such was the case here. T. L.'s inconsistent statements, fading memory, and what counsel termed "lies" all helped Lewis in closing argument portray her as somebody whose testimony was not to be trusted.

As to nurse Tilden, Lewis claims that her death prejudiced him because Tilden could have described T. L.'s demeanor right after the rape, which would have been relevant to the determination of whether the sexual encounter was consensual, and she could have testified to what, if any, inconsistent statements T. L. made that were later discarded per office policy. Again, these claims of alleged prejudice do not help Lewis. While Lewis is correct the stand-in testimony by nurse Schmidt could not have substituted for the evidence Lewis claims was lost by Tilden's death because it was not recorded, this gets him nowhere. Tilden *did* describe in her report T. L.'s demeanor at the interview. Moreover, Tilden did not have any special insight into T. L.'s demeanor right after the rape, as

9

she was not the first to speak with T. L. after the alleged
assault.  That person was the motel's clerk Nancy Ramirez who
testified T. L. was agitated and "very nervous."  Similarly, the
next person to see her, Deputy Turnbull, described her as "very
angry," and in need of "settl[ing] . . . down."  In light of
this evidence, Lewis's prejudice argument based on T. L.'s
demeanor fails.

Lewis's position that the loss of Tilden's testimony
regarding any discarded inconsistent statements made by T. L.
fares no better.  It is a speculative argument based on things
that *might* have happened, which is not sufficient to demonstrate
prejudice.  Moreover, even if there was testimony of T. L.'s
inconsistent statements to nurse Tilden, this would have added
little to the mix.  The jury was already well aware of T. L.'s
inconsistent statements, such as her testimony at trial that she
was forced into oral copulation and her statement to nurse
Tilden there was no "oral contact."

Balancing these factors, we find no deprivation of Lewis's
right to a speedy trial.  Although there was a one-and-one-half
year delay caused by factors outside Lewis's control, the
primary reason for the delay was legitimate -- to maintain
joinder in a large, complicated case with many witnesses and
defense attorneys -- and Lewis suffered minimal, if any,
prejudice as a result.  His speedy trial argument fails.

II

*The Court Did Not Err In Denying Snowden's Wheeler/Batson Motion*

Snowden contends the court erred in denying his *Wheeler/Batson* motion (*People v. Wheeler* (1978) 22 Cal.3d 258; *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69]), that was directed at prospective Juror D. T., an African American woman.

Specifically, Snowden contends the court violated his constitutional right to a jury drawn from a representative cross-section of the community because the record "contradicted one of the prosecutor's purported reasons in challenging [D. T.] and a comparative analysis belied another." We find no error in the court's denial of the *Wheeler/Batson* motion.

On appeal, "we review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges 'with great restraint. The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific, race- or group-neutral explanation related to the particular case being tried.'" (*People v. Ervin* (2000) 22 Cal.4th 48, 74-75.) "[I]f the trial court makes a '"'sincere and reasoned effort'"'" to evaluate the nondiscriminatory justifications the prosecutor offers, the court's conclusions are entitled to deference on appeal if supported by substantial evidence." (*Id.* at p. 76.)

Here, the prosecutor's three reasons for excusing D. T. were genuine, reasonably specific, and race-neutral. Those were: (1) D. T. was "essentially a social worker" who "essentially tries to prevent women who cannot take care of

11

their children, who are potentially criminals from being
prosecuted or a process by CPS in having their children taken
away from them"; (2) she weighed more than 300 pounds, which was
a "concern" because although "[i]t might have to do with
disease," "there [wa]s the simple explanation of sloth"; and (3)
"her brother within the last year was convicted of dope
possession or something to do with drugs" "[a]nd she was okay
with that process because he was on ankle monitoring."

    The court stated it had "listened very carefully to [the
prosecutor]'s rationale and reasoning behind each and every
challenge" and "d[id] not find that any of these peremptory
challenges ha[d] been exercised for an improper purpose."  As we
explain below, we defer to the trial court's conclusion because
it was supported by substantial evidence.

    As to the first reason, being "essentially a social
worker," Snowden points out that D. T.'s job was to "dr[i]ve a
van" for a nonprofit organization.  While he is correct, the
prosecutor was not required to turn a blind eye to the services
the nonprofit organization provided, especially in light of D.
T.'s description of the organization.  In D. T.'s words, the
organization "assist[ed]" "women, birth and beyond" "who ha[ve]
been reported to CPS . . . to prevent them from getting involved
with full CPS cases."  D. T. described her role as "driv[ing]
them to their group and classes that our organization
provide[s]."  From this description, there was nothing
objectionable about the prosecutor imputing a social worker
mentality to D. T.  Prosecutorial bias against people who work

in the "social services or caregiving fields" is a legitimate race-neutral reason to excuse a potential juror. (*People v. Perez* (1996) 48 Cal.App.4th 1310, 1315.)

As to the second reason, weighing over 300 pounds, Snowden compares D. T. to William Howard Taft and posits "it is doubtful the prosecutor would have assumed the Chief Justice's size reflected his sloth," and contends the prosecutor "had no problem imputing laziness to a black woman who was similarly overweight." Snowden's argument is speculative. He offers no evidence that, for example, the prosecutor failed to excuse other similarly overweight people from the jury and did so only because D. T. was an overweight African American woman. We do not express an opinion on whether obesity can ever be attributed to slothfulness. We simply note that the trial court apparently found this was a sincerely held view of the prosecutor. Thus, it was a race-neutral reason to excuse a potential juror.

As to the third reason, D. T.'s brother's conviction for a drug offense for which he had to wear an ankle monitor, the prosecutor could reasonably believe the brother's "adversary contact with the criminal justice system might make [T. D.] unsympathetic to the prosecution." (*People v. Arias* (1996) 13 Cal.4th 92, 138.)

Relying on a comparative juror analysis, Snowden contends the prosecutor's rationale was "pretextual" because the prosecutor failed to excuse three other jurors who described adverse contact with law enforcement. The first juror stated she knew "someone arrested for spousal abuse and a car theft."

13

The second juror stated he had a "negative experience" with law enforcement "about 20 years ago" when he and some friends were pulled over by police and they had to prove to police they "weren't gang members." The third juror "kn[e]w[] people [who] ha[d] been arrested for various offenses."

The problem with this comparison is that these jurors did not have a close family member who had gone through the criminal justice system, as had T. D. Another problem is that a comparative analysis actually *supports* the denial of the *Wheeler/Batson* motion. The prosecutor excused one prospective juror who had worked at a nonprofit organization called "The Birth Connection" doing "phone and office support," who did not deal directly with clients. He excused another who worked at the "Sacramento Mental Health Treatment Center." And he kept on the jury three African Americans. "Although not a conclusive factor, 'the passing of certain jurors may be an indication of the prosecutor's good faith in exercising his peremptories . . . .'" (*People v. Reynoso* (2003) 31 Cal.4th 903, 926.)

In conclusion, the prosecutor's three reasons for excusing D. T. were reasonably specific, race-neutral, and supported by the record. The trial court made a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, and we therefore defer to the trial court's ability to distinguish bona fide reasons from sham excuses. (*People v. Avila* (2006) 38 Cal.4th 491, 541.) On this record, there is no error.

14

III

*There Was No Brady/Trombetta Error*

Lewis and Snowden contend the People failed to disclose or retain favorable material evidence in violation of *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215].  They further contend the People violated their right to due process by failing to preserve evidence that might be potentially useful in their defense.  (*California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413].)

Their claim is based on Schmidt's testimony that nurses who conduct sexual assault examinations are trained by the district attorney to begin a new page if they must change an answer on the form.  They are to discard any documentation where victims had "change[d] the responses."  Schmidt was not sure whether during Tilden's interview, T. L. changed any of her answers and if she had, whether Tilden discarded those pages.

Defendants' claim of constitutional error fails for a simple reason:  they have not shown any evidence was destroyed in this case, let alone that it would have been favorable to them or might have played a significant role in their defense.

A *Brady* violation requires "[t]he evidence at issue . . . be favorable to the accused, either because it is exculpatory, or because it is impeaching."  (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282 [144 L.Ed.2d 286, 302].)  A *Trombetta* violation requires "evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality [citation], evidence must

15

both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California v. Trombetta*, *supra*, 467 U.S. at pp. 488-489, fn. omitted [81 L.Ed.2d at p. 422, fn. omitted].)   A necessary prerequisite in applying either of these doctrines, therefore, is evidence that was either withheld or destroyed.   Here, defendants have failed to demonstrate this as fact.   They only allege it might have been, which is not enough.

IV

*The Court Did Not Err In Denying The Request To Bifurcate The Gang Enhancement And In Admitting The Gang Expert Testimony*

Lewis contends the court violated his federal constitutional right to a fair trial by admitting gang expert testimony that was "irrelevant to any issue in dispute" and was "highly prejudicial."   Snowden contends the court erred in denying his request to bifurcate the gang enhancement, and even if it did not, the People's presentation of evidence to prove the gang enhancement resulted in "'gross unfairness'" amounting to a denial of due process.   They are wrong.

The trial court has broad discretion to deny bifurcation of a charged gang enhancement. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1046-1047.)   The propriety of the court's ruling must be based on the record before the trial court at the time of its ruling (*People v. Catlin* (2001) 26 Cal.4th 81, 110), and we review that ruling for abuse of discretion (*Hernandez*, at p. 1048).   Here, there was no abuse.

16

The record before the trial court included the preliminary hearing transcript and showed the following facts.  When Snowden forced T. L. into the car, Carr told her they were "going to fuck the shit out of [her]" and added, "[t]his is Piru, bitch." T. L. knew "Piru" was a gang.  When they forced her into the motel room, they were calling each other "Blood" or "Piru." This evidence of gang affiliation was relevant to the charged crimes because it led to a reasonable inference defendants were working in concert as members of the Piru gang, viewed their commission of the charged crimes as being tied to their gang membership, and informed their victim of their gang membership to induce fear and therefore her acquiescence.  To the extent this evidence would have supported both the gang enhancement and the charged offenses, "any inference of prejudice would be dispelled, and bifurcation would not be necessary."  (*People v. Hernandez*, *supra*, 33 Cal.4th at pp. 1049-1050.)  On this record, the court did not abuse its discretion in refusing to bifurcate the gang enhancement.

Snowden contends even if the court's ruling was "correct at the time it was made," reversal is still required because the failure to bifurcate resulted in "'gross unfairness'" amounting to a denial of due process.  Not so.

While some evidence used to prove the gang enhancement, such as the predicate offenses, was not related to the charged offenses, a court may still deny bifurcation if additional factors favored joinder.  (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1050.)  Here, the preservation of judicial

17

resources favored joiner as did the fact that some of the gang
evidence was cross-admissible.  Moreover, evidence of the
predicate offenses was not "so extraordinarily prejudicial"
"that it threaten[ed] to sway the jury to convict regardless of
the defendant's actual guilt."  (*Id.* at p. 1049.)  That evidence
consisted of Turnbull's testimony that two East Side Piru gang
members were convicted of attempted murder with firearms for
shootings that took place within one-half hour of each other and
that two other East Side Piru gang members were convicted of
sale of rock cocaine.  Turnbull further explained the main
activities of the East Side Piru gang were "[s]ales of
narcotics, assaults, assaults with deadly weapons, robberies,
carjacking, burglaries, [and] terrorist threats."  In contrast,
the current crimes were much more inflammatory -- the kidnapping
of a prostitute off the side of the street and her gang rape and
forced oral copulation that involved at least three East Side
Pirus.  On this record, Snowden's due process claim fails.

     For these reasons and some others, Lewis's argument of
error in admitting the gang expert testimony fails as well.  He
contends the expert witness testimony was "entirely irrelevant
given the lack of evidence establishing this was a gang related
offense" and should have been excluded because it constituted
"improper propensity evidence, unreliable and prejudicial
hearsay, and highly inflammatory evidence which was clearly more
prejudicial than probative."  He is wrong.

     Deputy Turnbull's testimony was relevant to the charged
offenses because it explained a motive for the current crimes,

i.e., gaining respect both inside and outside the gang "through intimidation and fear and through violence."  Committing crimes such as the current ones gave the gang "[n]otoriety" because it "g[ot] their name out there."

This probative value of Turnbull's testimony was not substantially outweighed by its prejudicial effect.  (Evid. Code, § 352.)  There was nothing particularly inflammatory about the gang evidence presented here, especially in comparison to the current offenses, which we have already explained.  On this record, Lewis's argument of error in admitting the expert witness gang testimony fails.

V

*The Court Did Not Err In Limiting Cross-Examination Of T. L.*

Lewis contends the court violated his constitutional rights by limiting T. L.'s cross-examination with respect to a 1995 conversation she had with an undercover officer.  We find no error.

Lewis asked to cross-examine T. L. regarding statements she made to an undercover officer in 1995 when she was soliciting prostitution.  Codefendants joined in the request.  According to a police report, T. L. told the undercover officer, "if you are lying about being an undercover officer and bust me, I'll kill you. . . .  [I]f you bust me, I'll fill a condom with sperm and say it's yours to get you in trouble."

The court ruled the evidence about T. L. "threaten[ing] to create a falsehood against an officer" was relevant because "your defense in this case is that she's lying about being

19

raped."  The evidence about her threatening to kill the officer
was also relevant because it "obviously bears upon her
credibility."  The evidence about planting evidence was
inadmissible because "the defense in this case is not that she
planted evidence, the defense in this case is she's lying about
consent."

    In front of the jury, the defense elicited the following
testimony from T. L. about the 1995 incident.  When asked
whether she made the statement, "if you're lying [about not
being an undercover police officer] and bust me, I'll kill you,"
T. L. testified she made that statement as a joke, explaining,
"I'm not going to kill a police officer.  You know that as well
as I am [sic].  I don't have any murders on my jacket."  When
asked if she "threaten[ed] to make a false claim against that
officer," T. L. responded, "I wouldn't call it a threat.
Because if it was a threat, they would have pursued it."

    Lewis contends this limited cross-examination restricted
him from showing T. L. made a "false claim *regarding sexual
relations*" and therefore demonstrating "her willingness to lie
about sexual conduct out of vindictiveness and to serve her own
purposes."  Lewis misses the point.  The court prohibited the
testimony about the condom because it was about planting
evidence -- something not present here.  "[N]ot every
restriction on a defendant's desired method of cross-examination
is a constitutional violation."  (*People v. Carpenter* (1999) 21
Cal.4th 1016, 1051.)  Unless the defendant can show that the
prohibited cross-examination would have produced a significantly

different impression of the witness's credibility, the trial
court's exercise of its discretion does not violate the Sixth
Amendment.   (*Carpenter*, at p. 1051.)   From the testimony the
court allowed, the jury learned T. L. had threatened to kill a
police officer, although she claimed it was in jest, and had
said she would make a false claim against a police officer,
although T. L. refused to classify it as a threat.   Delving into
the issue of the condom, which went to her propensity to plant
evidence, would have confused the issue, which here was T. L.'s
propensity to make a false claim of rape where the defense was
consent.   The record therefore does not establish the prohibited
cross-examination would have produced a significantly different
impression of the witness's credibility.   Therefore we find no
abuse.   (See *Carpenter*, at p. 1052.)

VI

*There Was Sufficient Evidence Of Forcible Rape In Concert*

Lewis contends his convictions for counts four through
seven (forcible rape in concert by Carr and Lewis) must be
reversed because there was insufficient evidence those counts
involved "force or violence."   He further contends his
convictions for counts eight and nine (forcible rape in concert
by Snowden) must be reversed because there was insufficient
evidence he acted "in concert" with Snowden.   He is wrong on
both points.

21

A

*There Was Sufficient Evidence Counts Four*
*Through Seven Involved Force Or Violence*

A conviction for rape in concert requires a showing the rape was accomplished by "force or violence." (Pen. Code,[3] § 264.1.)  It is enough if the evidence shows the use of force served to overcome the will of the victim to thwart or resist the attack; it is not necessary to show the use of force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker. (*People v. Griffin* (2004) 33 Cal.4th 1015, 1027.)

Here, there was evidence to establish force sufficient to overcome T. L.'s will as to all the forcible rape counts. When T. L. tried to get away from the car being driving by Carr, Snowden grabbed her by the hair and pulled her into the backseat of the car and slapped her a couple of times.  When they got to the room, she was "pleading with them . . . to let [her] go." Snowden and Lewis told her to take her clothes off, and when she refused, Lewis "grabbed her," slapped her face, and made her take off her nylons.  Carr "forced [her] into the restroom," and then raped her "doggy style" (count four).  He then "forced her to change positions" and get on the bathroom counter, where he raped her again (count five).

---

[3]    Further section references are to the Penal Code.

Lewis came in the bathroom next and told her "just let us do what we got to do." "He made [her] lay on the floor" and "raped [her] on her back" (count six). He also raped her on the sink (count seven). During the whole time the kidnapping and rapes were going on, T. L. pleaded with them to let her go.

The evidence we have just recounted involving T. L.'s abduction, accomplished by grabbing her hair and forcing her into the car, followed by threats delivered with physical force to her face and body, all while she was pleading with her assailants to let her go, were sufficient to show T. L.'s will to thwart or resist the ongoing attacks was overcome.

B

*There Was Sufficient Evidence Lewis Acted In Concert*

*With Snowden's Rape Of T. L.*

Lewis contends his convictions for counts eight and nine (which involved Snowden's rape of T. L. on the bed) must be reversed because there was insufficient evidence he acted in concert with Snowden. Lewis's contention focuses on the fact he left the room after he raped T. L. and went to room 423, "leaving Snowden alone with [T. L.] to do as he pleased." Lewis's argument gets him nowhere.

The crime of forcible rape in concert proscribes people from acting "together" either personally to commit the wrongful act or to aid others in doing so. (*People v. Jones* (1989) 212 Cal.App.3d 966, 969.) Here, Lewis's presence and actions on the street and at the motel before Snowden's rape of T. L. "contributed toward terrorizing the victim and overcoming her

23

resistance, thereby facilitating [Snowden's] rape[s]."   (*Id.* at

p. 970.)   As stated, when the assailants kidnapped T. L. off the

street, a couple of them said "they were going to fuck the shit

out of [her]."   At the motel, when T. L. refused to undress, it

was Lewis who "grabbed her," slapped her face,[4] and made her take

off her nylons.   When Lewis entered the bathroom, he told T. L.

"just let *us* do what we got to do."   (Italics added.)   Snowden

was the next to rape her after Lewis.   There was sufficient

evidence Lewis acted in concert with Snowden, even though he was

out of the room when Snowden raped T. L.

### VII

*The Prosecutor Did Not Commit Misconduct In Closing Argument*

Lewis contends the prosecutor committed five instances of

misconduct during closing argument, depriving him of his due

process right to a fair trial and "a reliable determination of

guilt."   Despite the lack of objection to some of the

prosecutor's comments, we address them all because Lewis alleges

his counsel was ineffective for failing to object.

---

[4]     Lewis cites another portion of the transcript where T. L.
stated that only Snowden used physical force against her.   By
relying on this evidence to show  insufficient evidence, Lewis
violates a fundamental principle of a sufficiency-of-evidence
review:   recounting the evidence in the light most favorable to
the judgment.   (*People v. Sanghera* (2006) 139 Cal.App.4th 1567,
1574.)

A

*Calling The Defense Gang Expert A "Whore"*

In arguing to the jury it should not believe the testimony of the defense gang expert Mark Harrison, the prosecutor argued, "Mr. Harrison is what's known in legal circles as a whore, okay? For 7000 dollars he'll come in here and he'll tell you this case was not gang related, and there's no such thing as rape for the benefit of a gang."  Lewis's counsel did not object.  Lewis now contends the prosecutor's characterization of Harrison as a "whore" was "outrageous and offensive."

There was no misconduct.  A prosecutor is not limited to "'"Chesterfieldian politeness"'" and may use an "epithet" in closing argument as long as it "'"amounts to fair comment on the evidence."'"  (*People v. Williams* (1997) 16 Cal.4th 153, 221.) Here, the use of the term "whore" to describe expert Harrison was not misconduct because the prosecutor made clear he was referring to the fact the expert received $7,000 for his testimony and argued he was selling his services for a price. This was acceptable advocacy.

B

*Referring To Defendants' Prior Criminal Acts As Part Of A Gang*

In arguing to the jury this was a gang case, the prosecutor stated, "Long before [defendants] see [T. L.] walking down Stockton Boulevard they have committed themselves to crime, to assaultive types of crimes, okay?  They have thought about the very prospect of raping a prostitute."  Lewis's counsel objected the comment "goes to character," and the court overruled the

25

objection because the comment "[wa]s argument."  On appeal,
Lewis claims the argument "improperly urged the jurors to rely
on propensity evidence to convict [defendants]."  Not so.

This was a fair comment on the evidence.  Detective
Turnbull testified defendants were part of the East Side Pirus,
and the gang's primary activity included assaults, robberies,
terrorist threats, and other violent crimes.  He further
testified the motive for the current crimes was gaining respect
both inside and outside the gang "through intimidation and fear
and through violence."  Committing crimes such as the current
ones gave the gang "[n]otoriety" because it "g[ot] their name
out there."  The prosecutor's arguments, therefore, were
"'"reasonable inferences, or deductions to be drawn"'" from this
evidence (*People v. Williams*, *supra*, 16 Cal.4th at p. 221) and
not inappropriate comments on defendants' propensity to commit
crimes.

C

*Referring To T. L.'s Flat Affect On The Witness Stand*

In arguing to the jury about T. L.'s veracity, the
prosecutor stated he "d[id]n't know that anyone can imagine what
it's like to be raped unless you've actually been there,"
referred to testimony at trial regarding "the loss of power and
the loss of control that a rape victim goes through," and noted
that while T. L.'s "testimony was flat, okay, because she
doesn't remember much about this anymore, and she's tried to
suppress it," "you caught glimpses of her pain . . . of her
suffering, of her grief."  Lewis's counsel objected the argument

26

"appeals to passion or prejudice," but the court overruled the objection.

"Although it is misconduct for a prosecutor to make comments calculated to arouse passion or prejudice [citation], the comments defendant challenges here were not so calculated." (*People v. Mayfield* (1997) 14 Cal.4th 668, 803.)  A reasonable juror would take the prosecutor's argument as an explanation for why T. L.'s testimony should be believed even though she had a flat affect, i.e., rape produces a profound response for the victim that was responsible for T. L.'s lack of emotion here. There was no misconduct.

D

*Referring To Defendants' Failure To Have Evidence Tested For DNA*

In responding to the argument made by Snowden's attorney that Snowden and Lewis "weren't even in th[e] room [425]," the prosecutor argued the defense "ha[d] subpoena powers, too," could have subpoenaed the evidence and had "it tested by some lab" and "they didn't because it's not gonna turn out anything favorable to them."  There was no objection.  On appeal, Lewis argues this "constituted improper vouching."  It did not.

A prosecutor does not commit misconduct by pointing to "a defendant's failure 'to introduce material evidence . . . .'" (*People v. Wash* (1993) 6 Cal.4th 215, 263.)  Here, the prosecutor's argument fits squarely within this rule.  Both Lewis and Snowden gave statements they were not in room 425. Had they wanted to support that theory, those defendants could have ordered DNA testing of items in the room.  They did not.

27

It was a fair comment on the state of the evidence for the
prosecutor to argue they failed to support these statements by
having evidence tested.  There was no misconduct.

E

*Responding To Snowden's Lawyer's Argument On*
*The Reasonable Doubt Instruction*

In responding to an argument Snowden's lawyer made
regarding reasonable doubt, the prosecutor stated as follows:

"And then [Snowden's lawyer] says he likens your decision
making to marriage, career, buying a house, medical procedure.
No.  Reasonable doubt is defined to you.  It's not -- I mean
those are just about as conservative a decision you can make in
your life, you know.  Who are you going to marry, okay?  That's
not your decision here.  All right?

"You're gonna buy a house.  You're gonna have a[n]
operation.  Those are life altering decisions.  That's not what
you're faced with here.  Don't be fooled, okay?  We have juries
up and down this state every day rendering guilty verdicts based
on reasonable doubt because it's asking you to just to reason,
to be reason -- to be reasonable and logical."

There was no objection to this argument.  On appeal, Lewis
argues "the prosecutor trivialized the appropriate standard by
which the defendants' actions should have been evaluated thereby
decreasing the prosecution's burden of proof . . . ."

In *People v. Nguyen* (1995) 40 Cal.App.4th 28, a case that
bears some similarity to this, the prosecutor argued without
objection the reasonable doubt standard was "'a very reachable

28

standard that you use every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving.'" "'I won't paraphrase it because it's a very difficult instruction, but it's not an unattainable standard. It's the standard in every single criminal case.'" (*Id.* at p. 35.) The appellate court "strongly disapprove[d] of arguments suggesting the reasonable doubt standard is used in daily life to decide such questions as whether to change lanes or marry. The argument is improper even when the prosecutor, as here, also states the standard for reasonable doubt is 'very high' and tells the jury to read the instructions." (*Id.* at p. 36.)

Here, the argument was somewhat similar because the prosecutor argued the application of the reasonable doubt instruction was an "every day" decision, but he went farther in arguing the standard was not as conservative as the standard to be used when deciding whom to marry, what house to buy, etcetera. This was wrong. "As our Supreme Court stated over 120 years ago . . . 'The judgment of a reasonable man in the ordinary affairs of life, however important, is influenced and controlled by the preponderance of evidence. Juries are permitted and instructed to apply the same rule to the determination of civil actions involving rights of property only. But in the decision of a criminal case involving life or liberty, something further is required. . . . There must be in the minds of the jury an abiding conviction, to a moral

29

certainty, of the truth of the charge, derived from a comparison and consideration of the evidence.'" (*People v. Nguyen*, *supra*, 40 Cal.App.4th at p. 36.)

As noted, though, there was no objection to the prosecutor's argument. In this procedural posture, and where Lewis has argued counsel was ineffective, we preliminarily ask whether counsel was deficient for failing to object. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) Although the argument was improper, we cannot say counsel was deficient for failing to object. He may not have wanted to draw attention to the improper argument, knowing the court was going to instruct on reasonable doubt shortly and it was the instruction that controlled. Since we can conceive of this as a reasonable tactical reason for failing to object, Lewis's ineffective assistance of counsel claim fails. (*People v. Wright* (1990) 52 Cal.3d 367, 404-405.)

### VIII

*Lewis Was Not Deprived Of The Right To*
*Meaningful Appellate Review By The Court's*
*Failure To Transcribe The Jury Instructions*

Lewis contends he was denied the right to meaningful appellate review when the trial court asked for, and received, a stipulation from defense attorneys that the court reporter did not need to transcribe the court's oral jury instructions. He is wrong.

We have urged courts to record its oral instructions to the jury to avoid any subsequent controversy over the accuracy of

the proceedings.  (*People v. DeFrance* (2008) 167 Cal.App.4th 486, 494.)  However, the absence of such a transcript does not necessarily violate due process.  In *People v. Garrison* (1989) 47 Cal.3d 746, 780-781, the court stated:  "We reject defendant's contention that the failure to report the reading of the instructions denied him due process.  The parties stipulated that the court reporter might be excused from reporting the reading of the jury instructions.  In light of counsel's stipulation and defendant's failure to suggest that there was any deviation in the reading from the typed copies contained in the record, we find no violation of due process."

Here, the parties stipulated the reporter did not have to transcribe the instructions.  After the court read the instructions, the parties confirmed they were "satisfied with the Court's reading of these jury instruction."  Under these circumstances, meaningful appellate review *is* possible:  the parties agreed the written instructions accurately reflected the oral instructions given to the jury.  There was no error.

IX

*The Court Did Not Err In Responding To The Jury's Questions*

Snowden contends the court's responses to two jury questions were incorrect and violated his federal constitutional right to due process.  We disagree.

The jury asked the following question:  "[R]egarding 'in concert' Do the people involved have to have specific <u>knowledge</u> that each other were going to or committed/performed oral copulation?"

31

The court instructed as follows:  "No.  [¶]  The aider and abettor need not have specific knowledge of the actual crime committed by the perpetrator, so long as the aider and abettor knew that the perpetrator intended to commit an unlawful sexual offense and acted with the intent to aid and abet the perpetrator in the commission of the unlawful sexual offense."

This was a correct statement of law.  A defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator.  (*People v. Hickles* (1997) 56 Cal.App.4th 1183, 1193.)  His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator.  (*Id.* at pp. 1193-1194.)  As such, it was immaterial whether defendants knew the exact sex act, i.e., oral copulation, that the perpetrator was going to commit, to be liable as an aider and abettor.  Snowden's argument that the court's response was incorrect and legally inadequate is without merit.

His second claim of instructional error relates to the following jury question:  "Is it possible to be in concert with one's self?  Is so, how?  Please give an example (hypothetical)."

The court responded as follows:  "A person can be found guilty of 'acting in concert' [in] 2 distinct ways:  [¶]  1)  He

32

can personally engage in the act constituting the crime, or 2)
He can aid and abet a person in accomplishing it.  [¶]   Please
refer to the Court's response to your question number 2.[5]   See
also Instructions no. 1001, 1016, 400 and 401."

Snowden argues the court should have simply stated, "'No.'"
We find no error because the court's instruction answered the
jury's questions correctly.  As is relevant here, the court
instructed the jury to refer to its response to "your question
number 2."   That response included the definition of "acting in
concert" as "two or more persons acting together in a group
crime and includes not only those who personally engage in the
act constituting the crime but also who aid and abet a person in
accomplishing it."   This instruction informed the jury it takes
more than one person to commit a crime "in concert."

X

*The Court Did Not Err In Imposing Full Consecutive Terms*

Snowden contends the court erred in imposing full
consecutive terms on counts four (sex by Carr on the toilet),

---

**5**     "[Q]uestion number 2" was as follows:  "Please further
define 'in concert.'  Especially in terms of aiding + abetting;
do they have to have knowledge of the specific crime being
committed?"

The court's response included the definition of "acting in
concert" as "two or more persons acting together in a group
crime and includes not only those who personally engage in the
act constituting the crime but also who aid and abet a person in
accomplishing it" and the element that a person who aids and
abets the perpetrator must do so "while voluntarily acting in
concert with another person."

33

five (sex by Carr on the sink), seven (sex by Lewis on the
sink), and nine (second act of sex on the bed by Snowden)
because they were not committed on separate occasions.

The trial court found the crimes were committed on separate
occasions because there was a "sufficient opportunity to pause
and reflect in between each of the sexual assaults . . . upon
this victim." On appeal, we will not disturb this finding
because it was supported by substantial evidence. (*People v.
Corona* (1988) 206 Cal.App.3d 13, 17.)

The trial court must impose "[a] full, separate, and
consecutive term" for certain sex offenses "if the crimes
involve separate victims or involve the same victim on separate
occasions." (§ 667.6, subd. (d).) The statute itself explains
how the term "separate occasions" is to be construed: "In
determining whether crimes against a single victim were
committed on separate occasions under this subdivision, the
court shall consider whether, between the commission of one sex
crime and another, the defendant had a reasonable opportunity to
reflect upon his or her actions and nevertheless resumed
sexually assaultive behavior. Neither the duration of time
between crimes, nor whether or not the defendant lost or
abandoned his or her opportunity to attack, shall be, in and of
itself, determinative on the issue of whether the crimes in
question occurred on separate occasions." (§ 667.6, subd. (d).)

The California Supreme Court has provided guidance
regarding when the "separate occasions" test is satisfied during
the same encounter. "Under the broad standard established by

34

. . . section 667.6, subdivision (d), the Courts of Appeal have
not required a break of any specific duration or any change in
physical location" for a finding that sexual assaults occurring
during a continuous encounter with a victim constituted separate
occasions.  (*People v. Jones* (2001) 25 Cal.4th 98, 104-105.)
Thus, for example, "a forcible violent sexual assault made up of
varied types of sex acts committed over time against a victim,
is not necessarily one sexual encounter" and "a trial court
could find a defendant had a 'reasonable opportunity to reflect
upon his or her actions' even though the parties never changed
physical locations and the parties 'merely' changed positions."
(*People v. Irvin* (1996) 43 Cal.App.4th 1063, 1071.)

Here, defendants raped T. L. in different positions and
locations using different methods, all which provide substantial
evidence to support the trial court's finding of separate
occasions.  As to counts four and five, the court could
reasonably find Carr's decision to change positions from the
toilet gave him the opportunity to reflect on what he was doing
before he began a new attack on the sink, especially because it
was during one of these episodes that Carr was able to
ejaculate.  The same rationale applies to count seven (rape by
Lewis on the sink), where to accomplish the act that resulted in
ejaculation, Lewis had to change positions from the floor.  As
to count nine (the second act of sex on the bed by Snowden), it
appeared the various positions gave Snowden a chance to reflect,
especially because, again, it was after changing positions

multiple times he was able to ejaculate.  The court did not error.

DISPOSITION

The judgments are affirmed.


_____ROBIE_____, J.


We concur:


_____SCOTLAND_____, P. J.


_____BLEASE_____, J.