1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    KEVIN LEWIS,                                No.  2:  11-cv-2072 JAM KJN P

12                  Petitioner,                   ORDER AND

13         v.                                     FINDINGS & RECOMMENDATIONS

14    C. GIBSON,

15                  Respondent.

16

17    Introduction

18            Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas

19    corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2007 conviction for kidnapping

20    (Cal. Penal Code § 209(b)(1)), robbery (Cal. Penal Code § 211), forcible oral copulation (Cal.

21    Penal Code § 288(d)) and four counts of rape (Cal. Penal Code § 264.1).  Petitioner is serving a

22    determinate sentence of 47 years to life and an indeterminate term of 25 years to life.  For the

23    following reasons, the undersigned recommends that the petition be denied.

24    Motion to Amend Petition

25            On December 27, 2011, petitioner filed an amended petition raising the following claims:

26    1) violation of the right to a speedy trial; 2) Brady/Trombetta violation; 3) denial of right to

27    confront witness (2 claims); and 4) ineffective assistance of trial and appellate counsel (2 claims).

28    (ECF No. 12.)  On February 24, 2012, respondent filed an answer to the amended petition.  (ECF

1

1   No. 19.)  On April 30, 2012, petitioner filed a reply to the answer.  (ECF No. 22.)

2          On October 3, 2013, petitioner filed a motion to stay this action in order to exhaust

3   additional claims.  (ECF No. 23.)  On November 21, 2013, respondent filed an opposition to this

4   motion.  (ECF No. 27.)

5          On October 30, 2014, petitioner filed a motion for leave to file a second amended petition.

6   (ECF No. 25.)  On November 21, 2013, respondent filed an opposition to this motion.  (ECF No.

7   27.)

8          On March 10, 2014, petitioner filed a motion for leave to file a third amended petition

9   containing newly exhausted claims.  (ECF No. 29.)  Petitioner also filed a third amended petition

10  containing all of the claims raised in the first amended petition as well as three newly exhausted

11  claims.  (ECF No. 30.)  On March 27, 2014, respondent filed an opposition to this motion.  (ECF

12  No. 31.)

13         Petitioner's motion for leave to file a second amended petition is denied as it is superseded

14  by the motion for leave to file a third amended petition.  Petitioner's motion to stay this action in

15  order to exhaust additional claims is denied as unnecessary.  The undersigned herein considers

16  petitioner's motion for leave to file a third amended petition.

17         Petitioner's third amended petition raises the following new claims:  1) trial counsel was

18  ineffective for failing to investigate and object to admission of the DNA evidence (ECF No. 30 at

19  22-23); 2) appellate counsel was ineffective for failing to raise the issue of trial counsel's failure

20  to investigate and object to admission of the DNA evidence (Id. at 25); and 3) the prosecutor

21  committed misconduct by misrepresenting the DNA evidence (Id. at 26).

22         Respondent argues that petitioner's motion for leave to file a third amended petition

23  should be denied because the new claims raised are not exhausted.  Respondent states that

24  petitioner raised these claims in a habeas corpus petition filed in the California Supreme Court on

25  November 7, 2013.  (Respondent's Lodged Document No. 23.)  On February 11, 2014, the

26  California Supreme Court denied this petition by order citing People v. Duvall, 9 Cal.4th 464

27  (1995), and In re Swain, 34 Cal.2d 300 (1949).   Based on the citations to Duvall and Swain,

28  respondent argues that these new claims are not exhausted.

1    The citations to Duvall and Swain reference the California rule that, to meet his initial

2    burden of pleading adequate grounds for relief, a California habeas petitioner must state fully and

3    with particularity the facts upon which relief is sought.  See People v. Duvall, 9 Cal.4th at 474; In

4    re Swain, 34 Cal.2d at 303–04; see also Gaston v. Palmer, 417 F.3d 1030, 1038–39 (9th Cir.

5    2005), modified, 447 F.3d 1165 (9th Cir. 2006), cert. denied, 549 U.S. 1134, (describing pleading

6    requirements of Duvall and Swain).  The failure to meet the pleading requirements of Duvall and

7    Swain can be cured in a renewed petition.  See Kim v. Villalobos, 799 F.2d 1317, 1319 (9th Cir.

8    1986).  Thus, where the California Supreme Court denies a habeas petition with citations to

9    Duvall or Swain, the denial can signify a failure to exhaust available state remedies.  See Kim,

10    799 F.2d at 1319.

11    In an order citing Duvall and In re Clark, 5 Cal.4th 750, 766 (1993) (newly discovered

12    evidence can be basis for habeas relief if it undermines the prosecution's entire case), the

13    Superior Court denied petitioner's habeas petition raising the new claims on grounds that he did

14    not attach a copy of the revised DNA lab report, on which his new claims are based.

15    (Respondent's Lodged Document No. 23.)  Thus, it appears likely that the California Supreme

16    Court's citation to Duvall and Swain is also based on petitioner's failure to attach a copy of the

17    revised DNA lab report to his petition filed in the California Supreme Court.

18    Based on the California Supreme Court's citations to Duvall and Swain, the undersigned

19    finds that the new claims contained in petitioner's third amended petition are not exhausted.

20    However, because these claims have no merit, as will be discussed herein, the undersigned may

21    address the merits.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may

22    be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies

23    available in the courts of the State.").  Accordingly, petitioner's motion for leave to file the third

24    amended petition containing these claims is granted.

25    After carefully considering, the undersigned recommends that the claims raised in the

26    third amended petition be denied.

27    ////

28    ////

3

1    Standards for a Writ of Habeas Corpus

2          An application for a writ of habeas corpus by a person in custody under a judgment of a

3    state court can be granted only for violations of the Constitution or laws of the United States.  28

4    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

5    application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California,

6    202 F.3d 1146, 1149 (9th Cir. 2000).

7          Federal habeas corpus relief is not available for any claim decided on the merits in state

8    court proceedings unless the state court's adjudication of the claim:

9                    (1) resulted in a decision that was contrary to, or involved an
                     unreasonable application of, clearly established Federal law, as
10                   determined by the Supreme Court of the United States; or

11                   (2) resulted in a decision that was based on an unreasonable
                     determination of the facts in light of the evidence presented in the
12                   State court proceeding.

13   28 U.S.C. § 2254(d).

14         Under section 2254(d)(1), a state court decision is "contrary to" clearly established United

15   States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in

16   Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a

17   decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537

18   U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

19         Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court

20   may grant the writ if the state court identifies the correct governing legal principle from the

21   Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

22   case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

23   that court concludes in its independent judgment that the relevant state-court decision applied

24   clearly established federal law erroneously or incorrectly.  Rather, that application must also be

25   unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough

26   that a federal habeas court, in its independent review of the legal question, is left with a 'firm

27   conviction' that the state court was 'erroneous.'") (internal citations omitted).  "A state court's

28   determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

4

1    jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>,

2    131 S. Ct. 770, 786 (2011).

3          The court looks to the last reasoned state court decision as the basis for the state court

4    judgment.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned decision,

5    "and the state court has denied relief, it may be presumed that the state court adjudicated the

6    claim on the merits in the absence of any indication or state-law procedural principles to the

7    contrary." <u>Harrington</u>, 131 S. Ct. at 784-85.  That presumption may be overcome by a showing

8    that "there is reason to think some other explanation for the state court's decision is more likely."

9    Id. at 785 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991)).

10        "When a state court rejects a federal claim without expressly addressing that claim, a

11   federal habeas court must presume that the federal claim was adjudicated on the merits – but that

12   presumption can in some limited circumstances be rebutted."  <u>Johnson v. Williams</u>, 133 S. Ct.

13   1088, 1096 (Feb. 20, 2013).  "When the evidence leads very clearly to the conclusion that a

14   federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de

15   novo review of the claim.  <u>Id.</u>, at 1097.

16        Where the state court reaches a decision on the merits but provides no reasoning to

17   support its conclusion, the federal court conducts an independent review of the record.

18   "Independent review of the record is not de novo review of the constitutional issue, but rather, the

19   only method by which we can determine whether a silent state court decision is objectively

20   unreasonable." <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

21   decision is available, the habeas petitioner has the burden of "showing there was no reasonable

22   basis for the state court to deny relief."  <u>Harrington</u>, 131 S. Ct. at 784.  "[A] habeas court must

23   determine what arguments or theories supported or, . . . could have supported, the state court's

24   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

25   arguments or theories are inconsistent with the holding in a prior decision of this Court."  <u>Id.</u> at

26   786.

27   ////

28   ////

1    Factual Background

2            The opinion of the California Court of Appeal contains a factual summary.  After

3    independently reviewing the record, the undersigned finds this summary to be accurate and

4    adopts it herein:

5                    In the early morning hours of July 9, 2005, T.L. was working as a
                prostitute in the area of Stockton Boulevard and Mack Road in
6                Sacramento. She was approached by a car driven by Christopher
                Carr with passengers Snowden, Peter Douet, and Lewis.  FN1
7

8                    FN1. Carr, Snowden, Douet, and Lewis were codefendants at trial.
                Only Snowden and Lewis are parties to this appeal.

9                    Snowden got out the car and came toward T.L. She tried to run
                away, but Snowden grabbed her by the hair, pulled her into the
10               backseat of the car, and slapped her a couple of times. Lewis took
                her purse, and Snowden reached into her bra and removed
11               approximately $120. A couple of them said "they were going to
                fuck the shit out of [her]" and added, "[t]his is Piru, Bitch." T.L.
12               knew "Piru" was a "Blood gang." They drove her to a Quality Inn
                motel in Rancho Cordova that was about 15 to 20 minutes away.
13               Snowden covered her eyes "pretty much" the entire time.

14                   When they reached the motel, Snowden kept his hands over T. L.'s
                eyes, and he and Lewis "put [her] in the elevator." They forced her
15               into room 425, as they were calling each other "Blood" or "Piru."
                T.L. was "pleading with them ... to let [her] go." Snowden and
16               Lewis told her to take her clothes off, and when she refused, Lewis
                "grabbed [her]," slapped her face, and made her take off her nylons.
17

18                   Carr "forced [her] in the restroom," and then raped her "doggy
                style" while she was holding the toilet and he was behind her. He
19               then "forced her to change positions" and get on the bathroom
                counter, where he "pushed his penis into her vagina." He eventually
20               was able to ejaculate. For part of the encounter, he wore a condom.

21                   Lewis came in the bathroom next and told T.L. "just let us do what
                we got to do." "He made [her] lay on the floor" and "raped [her] on
22               her back." He then raped her on the sink. He also eventually was
                able to ejaculate.

23                   Snowden then told T.L. to come out of the bathroom and into the
                bedroom. He "forced her initially to give him a blow job." He then
24               made her have sex with him while she was lying on her back on the
                bed. He also made her have sex with him "doggy style."
25               Eventually, he ejaculated in her mouth. For part of the encounter,
                he wore a condom.
26
                     By then, T.L. and Snowden were the only two left in room 425.
27               After Snowden finished raping T. L., he fell asleep, and she
                sneaked out of the room.
28

                                          6

T.L. went to the front desk and asked the motel's desk clerk Nancy Ramirez to call police because she had "just been raped." T .L. was agitated and "very nervous," and she told Ramirez to "hurry up" because they were still after her and there was "still somebody up there."

Sacramento County Sheriff Deputy Anthony Turnbull arrived in the motel lobby shortly thereafter. T.L. was "very angry," and he tried to "settle her down." She had redness and swelling around her eye and redness on her cheek. He spoke to her and then got keys for rooms 425 and 423.

In room 425, sheriff deputies found condoms and Lewis's latent left palm print on the bathroom tub. In room 423, they found Lewis and Snowden.

During an infield showup, T.L. identified Lewis and Snowden as two of the rapists.

Lewis told deputies he was the one who rented the rooms, but he knew nothing about a sexual assault, had not been with a prostitute that night, and did not recognize T. L.

Snowden told deputies he thought something had happened at the motel, but did not know what, and he had not been in room 425 that night. He had not had sex that night and had never picked up a prostitute.

After the infield showups, T.L. was taken to UC Davis Medical Center for an evidentiary examination. DNA samples taken from T. L.'s body were linked to Carr, Lewis, and Snowden. Nurse Liz Tilden from the sexual assault response team interviewed T.L. Nurse Tilden died in February 2007, so nurse practitioner Leslie Schmidt, who was familiar with Tilden's work, testified as to the contents of Tilden's examination form regarding T.L. T.L. was "'cooperative, with exam[,] quiet.'" T.L. admitted vaginal intercourse in the last five days but no "oral contact" within the last 24 hours. Her vaginal area was red and tender. The examination findings were consistent with both the "alleged sexual assault" and with consensual intercourse.

According to the policy of the district attorney, nurses who conduct these sexual assault examinations are trained to begin a new page if they must change an answer on the form and discard any documentation where they had "change[d] the responses." The intent was to "avoid any cross-outs ... because when you go back to review these, years later ..., and you see two answers and one's crossed out, you don't know if the patient decided that her answer was inaccurate and wanted to change it or if you had written down the wrong thing." The nurses "document what the patient feels is the most accurate as far as reporting." They were not "here to judge, [or] to make decisions." Schmidt did not know whether T.L. changed any of her answers during the interview and if she had, whether Tilden discarded the pages on which those initial answers appeared.

> Deputy Turnbull was the prosecution's gang expert. In his opinion, the current crimes were committed for the benefit of the East Side Pirus. The crimes gave the gang "[n]otoriety" because it "g[ot] their name out there." The crimes also gained the gang respect "through intimidation and fear and through violence."

(Respondent's Lodged Document 4 at 2-5.)

<u>Alleged Speedy Trial Violation</u>

Petitioner alleges that he was denied his right to a speedy trial.  The California Court of Appeal was the last state court to issue a reasoned decision addressing this claim.  (Respondent's Lodged Documents 4 (opinion of California Court of Appeal), 7 (petition for review), 8 (order by California Supreme Court denying petition for review.)

The California Court of Appeal denied this claim for the reasons stated herein:

> Lewis contends he was denied his right to a speedy trial because his trial took place one and one-half years after he was arraigned. Lewis's argument fails because he was not prejudiced by the delay.
>
> "The right to a speedy trial is a fundamental right ... guaranteed by the state and federal Constitutions." (<u>Rhinehart v. Municipal Court</u> (1984) 35 Cal.3d 772, 776, citing Cal. Const., art. I, § 15; U.S. Const., 6th Amend.) The United States Supreme Court has set forth the following four criteria by which the right to a speedy trial is to be judged: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (<u>Barker v. Wingo</u> (1972) 407 U.S. 514, 530 (<u>Barker</u>).) FN2
>
> FN2. The title of Lewis's argument asserts a deprivation of his federal and state constitutional rights to a speedy trial and his state statutory right to a speedy trial. In his argument, however, he simply recites the pertinent state constitutional provision and state statutory provisions that encompass the speedy trial right and focuses his argument on the four <u>Barker</u> factors. As he has developed no argument about his speedy trial rights under the state Constitution or California statutes, we limit our discussion to Lewis's federal speedy trial right claim.
>
> The first factor-length of delay-serves as a triggering mechanism. (<u>Barker</u>, <u>supra</u>, 407 U.S. at p. 530.) Generally a postaccusation delay is considered "'presumptively prejudicial'" when it approaches one year. (<u>Doggett v. United States</u> (1992) 505 U.S. 647, 652, fn. 1.) Here, Lewis was arraigned on January 4, 2006, and trial began on September 4, 2007. It was therefore a year and one-half between Lewis's arraignment on the information and his trial, so the delay necessitates "inquiry into the other factors that go into the balance." (<u>Barker</u>, supra, 407 U.S. at p. 530.)
>
> The second factor-reason for the delay-requires "different weights [to] be assigned to different reasons." (<u>Barker</u>, <u>supra</u>, 407 U.S. at p.

8

531.) "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily.... Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." (Ibid., fn. omitted.)

Here, the People did not request any continuances. Rather, the continuances were requested by defense attorneys (other than Lewis's) for failure to complete the "DNA work," multiple ongoing trials, and the serious illness of one of the defense attorneys that necessitated bed rest. The court noted there were "a total of eight lawyers involved in this case" and it was trying to coordinate all of those schedules. The People's position was defendants "need[ed] to be tried jointly as a matter of convenience, the witnesses and presentation of evidence," and the victim would be caused "extreme hardship" and "prejudice" to be "subjected to being on the stand twice." In a trial such as this one, involving numerous charges, defendants, witnesses, and lawyers, these were valid reasons for delaying the trial. (U.S. v. Vega Molina (1st Cir. 2005) 407 F.3d 511, 532-533.)

The third factor-the defendant's assertion of his right-weighs in Lewis's favor. (Barker, supra, 407 U.S. at pp. 531-532.) Lewis repeatedly asserted his right to a speedy trial and refused to enter time waivers.

The final factor-prejudice to the defendant-is to be assessed in light of the interests a speedy trial was designed to protect: preventing "oppressive" pretrial incarceration, minimizing "anxiety and concern of the accused," and "limit[ing] the possibility that the defense will be impaired." (Barker, supra, 407 U.S. at p. 532.) The last interest is the most serious. (Ibid.)

Here, there is no evidence Lewis was subject to "oppressive" pretrial incarceration or he was anxious or concerned other than the fact he repeatedly objected to further continuances. Most importantly, there was no evidence Lewis's defense was impaired by the delay in bringing this case to trial. None of his witnesses died or disappeared before trial (Barker, supra, 407 U.S. at p. 532) and there was no demonstrated loss of exculpatory evidence.

In attempting to demonstrate prejudice, Lewis relies heavily on T. L.'s faded memory and the death of nurse Tilden. T.L. was the People's main witness and claims by Lewis that she "changed her testimony from one questioner to the next and stated she did not remember the details of the night in question," do not assist his prejudice argument. Delay can work to a defendant's benefit, because "[a]s the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof." (Barker, supra, 407 U.S. at p. 521.) Such was the case here. T. L.'s inconsistent statements, fading memory, and what counsel termed "lies" all

helped Lewis in closing argument portray her as somebody whose testimony was not to be trusted.

As to nurse Tilden, Lewis claims that her death prejudiced him because Tilden could have described T. L.'s demeanor right after the rape, which would have been relevant to the determination of whether the sexual encounter was consensual, and she could have testified to what, if any, inconsistent statements T.L. made that were later discarded per office policy. Again, these claims of alleged prejudice do not help Lewis. While Lewis is correct the stand-in testimony by nurse Schmidt could not have substituted for the evidence Lewis claims was lost by Tilden's death because it was not recorded, this gets him nowhere. Tilden did describe in her report T. L.'s demeanor at the interview. Moreover, Tilden did not have any special insight into T. L.'s demeanor right after the rape, as she was not the first to speak with T.L. after the alleged assault. That person was the motel's clerk Nancy Ramirez who testified T.L. was agitated and "very nervous." Similarly, the next person to see her, Deputy Turnbull, described her as "very angry," and in need of "settl [ing] ... down." In light of this evidence, Lewis's prejudice argument based on T. L.'s demeanor fails.

Lewis's position that the loss of Tilden's testimony regarding any discarded inconsistent statements made by T.L. fares no better. It is a speculative argument based on things that might have happened, which is not sufficient to demonstrate prejudice. Moreover, even if there was testimony of T. L.'s inconsistent statements to nurse Tilden, this would have added little to the mix. The jury was already well aware of T. L.'s inconsistent statements, such as her testimony at trial that she was forced into oral copulation and her statement to nurse Tilden there was no "oral contact."

Balancing these factors, we find no deprivation of Lewis's right to a speedy trial. Although there was a one-and-one-half year delay caused by factors outside Lewis's control, the primary reason for the delay was legitimate-to maintain joinder in a large, complicated case with many witnesses and defense attorneys-and Lewis suffered minimal, if any, prejudice as a result. His speedy trial argument fails.

(Id. at 6-10.)

"The Sixth Amendment guarantees that [i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial." Vermont v. Brillon, 556 U.S. 81, 89 (2009) (citations and internal quotation marks omitted, alterations in original); Doggett v. United States, 505 U.S. 647, 651 (1992); Barker v. Wingo, 407 U.S. 514, 515 (1972). As noted by the California Court of Appeal, the court must balance four factors in determining whether there has been a violation of the right to a speedy trial: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted the right to a speedy trial; and (4) whether the defendant suffered prejudice as

10

1    a result of the delay.  See Doggett, 505 U.S. at 651 (citing Barker, 407 U.S. at 530).  No one

2    factor is necessary or sufficient and there is no affirmative demonstration of prejudice necessary

3    to prove a violation of the right to a speedy trial; instead, the four related factors "must be

4    considered together with such other circumstances as may be relevant."  Moore v. Arizona, 414

5    U.S. 25, 26 (1973) (per curiam) (citation omitted).

6            For the following reasons, the undersigned finds that the denial of petitioner's speedy trial

7    claim by the California Court of Appeal was not an unreasonable application of clearly

8    established Supreme Court authority.

9            As noted by the California Court of Appeal, the delay in petitioner's case of

10   approximately 1 ½ year was presumptively prejudicial and triggered consideration of the factors

11   set forth above.  Doggett v. U.S., 505 U.S. at 652 n.1.

12           The California Court of Appeal reasonably found that the second factor, i.e., reason for

13   the delay, did not weigh in petitioner's favor.  The trial was delayed several times due to requests

14   by counsel for petitioner's co-defendants.[1]  Delays due to the prosecution's desire to conduct joint

15   trial does not weigh against the prosecution because the law favors such trials.  See U.S. v.

16   Davenport, 935 F.2d 1223, 1240 (1st Cir. 1991); U.S. v. Vega Molina, 407 F.3d 511, 532-33 (1st

17   Cir. 2005) (18 month delay did not violate Speedy Trial Act in complicated case involving a

18   variety of charges, a multiplicity of defendants, witnesses and lawyers and a protracted trial).  As

19

20   _____

[1]   In his opening brief on appeal, petitioner cited the following reasons for the delays:  1) on
March 3, 2006, counsel for co-defendants Carr and Douet request a continuance based on the

21   failure to complete DNA testing; 2) the trial set for June 27, 2006, was re-set to October 17, 2006
due to the unavailability of counsel for co-defendant Carr; 3) on October 17, 2006, the trial was

22   re-set to October 24, 2006, due to the unavailability of counsel for co-defendant Carr, who was
both ill and in trial; 4) on October 24, 2006, the trial was re-set to November 3, 2006, because

23   counsel for co-defendant Carr was seriously ill and unavailable indefinitely; 5) on November 2,
2006, counsel for co-defendant Carr recovered from his illness but both he and counsel for-co-

24   defendant Douet would not be available until after February 5, 2007, due to numerous trials; 6) on
February 2, 2007, the trial was continued because counsel for co-defendant Carr was in trial; 7)

25   on April 13, 2007, petitioner's counsel Michel requested a 30 day continuance because the lead
counsel, Nelson, was out on medical leave until mid-May 2007; 8) on May 25, 2007, counsel for

26   co-defendant Carr requested a continuance because he was in trial until August 27, 2007; the trial

27   court continued the case to August 24, 2007, for trial readiness.  (Respondent's Lodged
Document 1 at 36-43.)  The trial began on September 4, 2007.  (CT at 188.)

28

1 noted in his direct appeal, the prosecutor told the court on three occasions that the co-defendants

2 should be jointly tried. (Respondent's Lodged Document 1 at 37 (citing Augmented Court

3 Transcript ("ACT") at 211), 39 (citing ACT at 186), 40 (citing ACT at 198-201).

4    The record demonstrates that petitioner's trial was delayed for legitimate reasons, i.e., the

5 prosecutor's reasonable desire to conduct a joint trial, and schedule conflicts and illness of the

6 defense counsel involved.

7    The California Court of Appeal reasonably found that the third factor, i.e., assertion of the

8 right to a speedy trial, weighed in petitioner's favor because petitioner repeatedly asserted his

9 right to a speedy trial.

10    The California Court of Appeal reasonably found that the third factor, i.e., prejudice, did

11 not weigh in petitioner's favor.  The Supreme Court has identified three types of prejudice caused

12 by excessive delay: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused;

13 and (3) impairment of the defense.  Barker, 407 U.S. at 532.

14    The California Court of Appeal reasonably found that petitioner did not suffer from

15 oppressive pretrial incarceration or anxiety.

16    The California Court of Appeal also reasonably found that petitioner's defense was not

17 significantly impaired by the delays.  Petitioner first argues that he was prejudiced by the victim's

18 fading memory.   In his opening brief on appeal, petitioner argued that the victim testified that she

19 could not remember the night of the incident and changed her testimony from one questioner to

20 the next. (Respondent's Lodged Document 1 at 55-56.)

21    In his closing argument, as noted by the California Court of Appeal, petitioner's counsel

22 used the victim's faded memory to his advantage.  Counsel cited her inconsistent statements

23 regarding whether she was blindfolded, whether there was a phone in the room, whether she was

24 punched or slapped and whether there was a gun. (RT at 2412.)  Counsel argued that she made

25 up details to make her story more believable.  (Id. at 2412-14.)

26    It is possible that a witnesses fading memory could prejudice a defendant.  However, as

27 noted by the California Court of Appeal, in this case the victim's fading memory helped

28 petitioner portray her as somebody whose testimony could not be trusted.  The delay did not

1   prejudice petitioner in his challenge to the victim's credibility.

2         Petitioner also argues that he was prejudiced by the delay because he could not question

3   Nurse Tilden, who interviewed the victim after the rapes, regarding any inconsistent statements

4   the victim may have made.  Petitioner argues that Nurse Tilden, who died in February 2007 (Id. at

5   1376), was the only person who could testify to those inconsistencies, because of the policy to

6   delete any inconsistent statements.  Petitioner also argues that he was prejudiced because Nurse

7   Tilden was unavailable to testify regarding the victim's demeanor during the interview.

8         As noted by the California Court of Appeal, Nurse Schmidt testified that, in her report,

9   Nurse Tilden described the victim's demeanor as quiet and cooperative.  (Id. at 1428.)  Because

10  evidence was presented regarding Nurse Tilden's observations of the victim's demeanor,

11  petitioner was not prejudiced by Nurse Tilden's unavailability to testify regarding this issue.  In

12  addition, as noted by the California Court of Appeal, other witnesses testified regarding the

13  victim's demeanor immediately after the rapes.

14        The California Court of Appeal reasonably rejected petitioner's argument that he was

15  prejudiced by the loss of Nurse Tilden's testimony regarding any discarded inconsistent

16  statements made by the victim.  As noted by the California Court of Appeal, this argument is

17  speculative.  In addition, the victim made plenty of inconsistent statements.  It is very unlikely

18  that testimony by Nurse Tilden potentially regarding additional inconsistent statements made by

19  the victim during the interview would have had a material impact on the outcome of the trial.

20        The undersigned observes that the victim made statements to Nurse Tilden, as described

21  by Nurse Schmidt, that were inconsistent with her trial testimony.  For example, the victim told

22  Nurse Tilden that she had not used drugs in the previous 96 hours.  (Id. at 1384.)  At trial, the

23  victim testified that she used methamphetamine the night before the rapes and smoked marijuana

24  the day of the rapes.  (Id. at 414-15.)  The victim told Nurse Tilden that no weapons were used.

25  (Id. at 1386).  At trial, she testified that she may have been told to get in the car at gunpoint.  (Id.

26  at 418.)  The victim also told Nurse Tilden that she was slapped in the face twice.  (Id. at 1386.)

27  At trial, she testified that she was punched with a closed fist.  (Id. at 427.)  Therefore, petitioner

28  was able to challenge the victim's credibility using statements she made to Nurse Tilden that were

1    inconsistent with her trial testimony.

2         In addition, Nurse Schmidt testified that the reason for the policy requiring SART nurses

3    to start a new page if a victim changes an answer is "because when you go back to review these,

4    years later, for instance, in this case, and you see two answers and one's crossed out, you don't

5    know if the patient decided that her answer was inaccurate and wanted you to change it or if you

6    had written down the wrong thing." (Id. at 1409.)  In other words, the purpose of the policy was

7    to ensure that the reports were accurate and would not be later misinterpreted.

8         For the reasons discussed above, the undersigned finds that the California Court of Appeal

9    reasonably found that petitioner's claim that his defense was impaired by the prosecution's failure

10   to retain any pages of Nurse Tilden's report containing answers later changed by the victim was

11   speculative and unsupported.

12        Petitioner also argues that he was prejudiced by the loss of a hotel video surveillance tape.

13   Petitioner argues that this tape would show that the victim entered the hotel voluntarily.  The

14   California Court of Appeal did not specifically address this argument.  Petitioner's second

15   amended petition contains more extensive briefing regarding this claim.  For that reason, the

16   undersigned references the second amended petition herein.

17        Petitioner argues that the evidence showed that the hotel had surveillance cameras which

18   would have showed the parking lot and entry activity for the hotel lobby.  (ECF No. 12 at 39.)

19   Petitioner states that Detective McBeth-Childs obtained the video from the cameras from the

20   hotel and began watching it on July 25, 2005, until it froze due to a technical problem.  (Id., citing

21   RT at 1068-70.)  Detective McBeth-Childs requested an additional copy of the tape from the

22   hotel.  (Id., citing RT at 1069-70.)  Receiving no response, she called a few weeks later and was

23   referred to Swift Communications, from whom she requested a copy.  (Id., citing RT at 1070-71.)

24   Swift Communications did not send a copy of the tape.  (Id., citing RT at 1071.)  Detective

25   McBeth-Childs made no further efforts to obtain a copy of the tape.  (Id., citing RT at 1072.)  In

26   his direct appeal, petitioner argued that "[c]learly, by the time of trial over two years later, the

27   video was no longer available."  (Respondent's Lodged Document 1 at 58.)

28   ////

Petitioner's argument that the videotape was "clearly" unavailable at the time of trial is unsupported. Petitioner has not demonstrated that the videotape was not available at the time of trial. Petitioner does not claim that his attorney, or any other defense attorney, requested the videotapes at any time. Petitioner's suggestion that the videotape was exculpatory is also speculative. As discussed in more detail herein, the evidence that the victim did not enter the hotel voluntarily and did not consent to having sex with petitioner and his co-defendants was strong. It is unlikely that the hotel videotape would have changed the outcome of the trial. For these reasons, petitioner's claim alleging a speedy trial violation based on the hotel videotape is without merit.

For the reasons discussed above, the undersigned finds that the finding by the California Court of Appeal that petitioner's right to a speedy trial was not violated was not an unreasonable application of clearly established Supreme Court authority. The California Court of Appeal reasonably applied the factors set forth in Barker v. Wingo to find no violation of petitioner's speedy trial rights. Accordingly, this claim should be denied.

Alleged Brady/Trombetta Violation

The California Court of Appeal was the last state court to issue a reasoned decision addressing this claim. (Respondent's Lodged Documents 4 (opinion of California Court of Appeal), 7 (petition for review), 8 (order by California Supreme Court denying petition for review.)

Petitioner alleges that the prosecution violated Brady v. Maryland, 373 U.S. 83 (1963), and California v. Trombetta, 467 U.S. 479 (1984), by failing to retain favorable evidence. The California Court of Appeal denied this claim for the reasons stated herein:

> Lewis and Snowden contend the People failed to disclose or retain favorable material evidence in violation of Brady v. Maryland (1963) 373 U.S. 83. They further contend the People violated their right to due process by failing to preserve evidence that might be potentially useful in their defense. (California v. Trombetta (1984) 467 U.S. 479.)
>
> Their claim is based on Schmidt's testimony that nurses who conduct sexual assault examinations are trained by the district attorney to begin a new page if they must change an answer on the form. They are to discard any documentation where victims had

15

1   "change[d] the responses." Schmidt was not sure whether during
2   Tilden's interview, T.L. changed any of her answers and if she had, whether Tilden discarded those pages.

3   Defendants' claim of constitutional error fails for a simple reason: they have not shown any evidence was destroyed in this case, let
4   alone that it would have been favorable to them or might have played a significant role in their defense.

5

6   A Brady violation requires "[t]he evidence at issue ... be favorable to the accused, either because it is exculpatory, or because it is
7   impeaching." (Strickler v. Greene (1999) 527 U.S. 263, 281-282.) A Trombetta violation requires "evidence that might be expected to
8   play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must both
9   possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be
10  unable to obtain comparable evidence by other reasonably available means." (California v. Trombetta, supra, 467 U.S. at pp. 488-489,
11  fn. omitted.) A necessary prerequisite in applying either of these doctrines, therefore, is evidence that was either withheld or
12  destroyed. Here, defendants have failed to demonstrate this as fact. They only allege it might have been, which is not enough.

13  (Respondent's Lodged Document 4 at 15-16.)

14      In Brady, 373 U.S. at 87, the Supreme Court held that "the suppression by the prosecution

15  of evidence favorable to an accused upon request violates due process where the evidence is

16  material either to guilt or punishment, irrespective of the good faith or bad faith of the

17  prosecution." Evidence is material only if there is a "'reasonable probability' that had the

18  evidence been disclosed the result at trial would have been different." Wood v. Bartholomew,

19  516 U.S. 1, 5 (1995) (per curiam); United States v. Bagley, 473 U.S. 667, 682 (1985). A

20  "reasonable probability" is a probability sufficient to undermine confidence in the outcome. See

21  Bagley, 473 U.S. at 682. The obligation extends to favorable evidence that was not requested by

22  the defense. See Kyles v. Whitley, 514 U.S. 419, 432–34 (1995); Carriger v. Stewart, 132 F.3d

23  463, 479 (9th Cir. 1997) (en banc).

24      In Trombetta, 467 U.S. at 489, the Supreme Court held that where the government fails to

25  preserve evidence that is potentially exculpatory, the right to due process is violated only if it

26  possesses "an exculpatory value that was apparent before the evidence was destroyed, and [is] of

27  such a nature that the defendant would be unable to obtain comparable evidence by other

28  reasonably available means." In Arizona v. Youngblood, 488 U.S. 51, 58 (1988), the Supreme

16

1    Court imposed the additional requirement that the defendant demonstrate the government's bad

2    faith in failing to preserve the potentially useful evidence.  See United States v. Booth, 309 F.3d

3    566, 574 (9th Cir. 2002); Cooper v. Calderon, 255 F.3d 1104, 1113–14 (9th Cir. 2001).

4            The California Court of Appeal reasonably denied petitioner's Brady/Trombetta claim

5    because petitioner failed to demonstrate that any changed pages from Nurse Tilden's report

6    existed or that they contained exculpatory value.  As discussed above, the purpose of starting a

7    new page if the victim changed an answer was to ensure the accuracy of the report and to make

8    sure it was not misinterpreted years later.  This policy does not indicate bad faith by the

9    government.  Moreover, petitioner's claim that he was prejudiced by the prosecution's failure to

10   retain the pages is speculative.  Under these circumstances, petitioner has failed to demonstrate

11   prejudice.  See Cunningham v. City of Wenatchee, 345 F.3d 802, 812 (9th Cir. 2003) (rejecting

12   Trombetta claim where value of evidence and showing of bad faith were speculative);  Wood v.

13   Bartholomew, 516 U.S. 1, 8 (1995) (per curiam) (granting a habeas corpus petition "on the basis

14   of little more than speculation" is improper); Runningeagle v. Ryan, 686 F.3d 758, 769 (9th Cir.

15   2012) ("[T]o state a Brady claim, [petitioner] is required to do more than 'merely speculate' about

16   what Melendez told prosecutors."); Barker v. Fleming, 423 F.3d 1085, 1099 (9th Cir. 2005) ("The

17   mere possibility that an item of undisclosed information might have helped the defense, or might

18   have affected the outcome of the trial, does not establish materiality in the constitutional sense.");

19   Phillips v. Woodford, 267 F.3d 966, 987 (9th Cir. 2001) (rejecting Brady claim based on "mere

20   suppositions" with "absolutely no evidence" that the allegedly withheld material, if it existed,

21   "would have contained exculpatory evidence"); Downs v. Hoyt, 232 F.3d 1031, 1037 (9th Cir.

22   2000) (rejecting Brady claim because "Downs's arguments ... are speculative and fail to point out

23   ... how production of [the withheld] materials would have created a reasonable probability of a

24   different result").

25           The California Court of Appeal's denial of petitioner's Brady/Trombetta claim was not an

26   unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

27   should be denied.

28   ////

17

1    Alleged Violations of Right to Confront Witness

2            *Testimony of Nurse Schmidt*

3            Petitioner alleges that he was denied his right to confrontation when Nurse Schmidt

4    testified as to the contents of the report prepared by Nurse Tilden, who was unavailable because

5    she had passed away.  In the answer, respondent argues that this claim is not exhausted.

6    Respondent argues that petitioner raised this claim in a habeas corpus petition filed in the

7    California Supreme Court on June 13, 2011.  (Respondent's Lodged Document No. 9.)  On

8    October 19, 2011, the California Supreme Court denied this petition by order citing People v.

9    Duvall, 9 Cal.4th 464, 474 (1995), and In re Swain, 34 Cal.2d 300, 304 (1949).  (Respondent's

10   Lodged Document No. 10.)

11           As discussed above, the citations to In re Swain and People v. Duvall can signify a failure

12   to exhaust available state remedies.  See Kim, 799 F.2d at 1319.

13           On November 1, 2011, petitioner filed a second petition in the California Supreme Court

14   raising the instant Confrontation Clause claim.  (Respondent's Lodged Document No. 11.)  On

15   March 14, 2012, the California Supreme Court denied this petition without comment or citation.

16   (Respondent's Lodged Document No. 17.)  Accordingly, this claim is exhausted.  Because this

17   claim was denied in an unreasoned decision, the undersigned conducts an independent review of

18   the record to determine whether the denial of this claim by the California Supreme Court was a

19   reasonable application of clearly established Supreme Court authority.

20           The Confrontation Clause bars the state from introducing into evidence out-of-court

21   statements which are "testimonial" in nature unless the witness is unavailable and the defendant

22   had a prior opportunity to cross-examine the witness, regardless of whether such statements are

23   deemed reliable.  Crawford v. Washington, 541 U.S. 36 (2004).   The Crawford rule applies only

24   to hearsay statements that are "testimonial" and does not bar the admission of non-testimonial

25   hearsay statements.  Id. at 42, 51, 68.  See also Whorton v. Bockting, 549 U.S. 406, 420 (2007)

26   ("the Confrontation Clause has no application to" an "out-of-court nontestimonial statement.")

27   Although the Supreme Court in Crawford declined to provide a comprehensive definition of the

28   term "testimonial," the court did recognize that "[s]tatements taken by police officers in the

18

1    course of interrogations are ... testimonial under even a narrow standard." Crawford, 541 U.S. at

2    52.  The court also provided the following "formulations" of a "core class" of testimonial

3    statements: (1) "ex parte in-court testimony or its functional equivalent—that is, material such as

4    affidavits, custodial examinations, prior testimony that the defendant was unable to cross-

5    examine, or similar pretrial statements that declarants would reasonably expect to be used

6    prosecutorially;" (2) "extrajudicial statements ... contained in formalized testimonial materials,

7    such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were

8    made under circumstances which would lead an objective witness reasonably to believe that the

9    statement would be available for use at a later trial." Id. at 51–52.

10       In addition, Confrontation Clause violations are subject to harmless error analysis.

11   Whelchel v. Washington, 232 F.3d 1197, 1205–06 (9th Cir. 2000).  "In the context of habeas

12   petitions, the standard of review is whether a given error 'had substantial and injurious effect or

13   influence in determining the jury's verdict.'"  Christian v. Rhode, 41 F.3d 461, 468 (9th Cir.

14   1994) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  Factors to be considered when

15   assessing whether a Confrontation Clause violation is harmless error include the importance of

16   the testimony, whether the testimony was cumulative, the presence or absence of evidence

17   corroborating or contradicting the testimony, the extent of cross-examination permitted, and the

18   overall strength of the prosecution's case.  Van Arsdall, 475 U.S. at 684; United States v.

19   Norwood, 603 F.3d 1063, 1068–69 (9th Cir.2010).

20       At the outset, the undersigned finds that the at-issue statements, i.e., statements from

21   Nurse Tilden's report, were testimonial in nature.

22       Petitioner first argues that admission of Nurse Schmidt's testimony regarding the results

23   of Nurse Tilden's physical examination of the victim violated the Confrontation Clause.

24   Assuming admission of these statements violated the Confrontation Clause, the undersigned finds

25   that their admission was harmless error because the evidence against petitioner was strong and the

26   outcome of the trial would not have been different had this testimony not been admitted .

27       The victim testified that she was forced into the car and then taken to the hotel and raped.

28   (RT at 410-99.)  The victim's testimony regarding being raped by petitioner was corroborated by

19

1   the DNA swabbings from her vagina and cervix that were linked to petitioner.  (Id. at 1296, 1300-

2   02, 1306.)  In addition, petitioner's latent prints were found on the bathtub in room 425.  (Id. at

3   1222.)

4        The victim's testimony was also corroborated by witnesses Brittany Sullivan and

5   Stephanie Coleman, who were with petitioner and his co-defendants during part of the evening on

6   which the rapes occurred.  Stephanie Coleman testified that on the night of the incident, she was

7   in the car with petitioner and his co-defendants.  (Id. at 707-09.)  She was in the back seat of the

8   car with petitioner.  (Id. at 710.)  Coleman testified that when they saw the victim, co-defendant

9   Snowden got out of the car and grabbed her by the hair and put her in the car.  (Id. at 712.)   In an

10   interview with Officer McBeth-Childs, Coleman stated that one of petitioner's co-defendants took

11   money out of the victim's bra as they traveled in the car.  (Id. at 721.)  Coleman testified that

12   when they got to the hotel, she wanted to leave because petitioner's co-defendant Douet was

13   making the victim take her clothes off.  (Id. at 726.)  Douet told the victim to get in the closet and

14   take off her clothes.  (Id.)  Coleman left the hotel before the rapes occurred.

15        Brittney Sullivan testified that she was riding in a car that was following the one in which

16   Coleman, petitioner and his co-defendants were riding on the night of the incident.  (Id. at 264-

17   71.)  In an interview with police after the incident, Sullivan stated that she saw the car stop next to

18   the victim and that she could tell the victim was scared because she started running.  (Id. at 291.)

19   In this interview, Sullivan also stated that she saw co-defendant Snowden grab the victim from

20   behind in a kind of bear hug and put her in the car.  (Id. at 292-93.)  In this interview, Sullivan

21   stated that Coleman later told her that the victim was in the hotel room.  (Id. at 302.)

22        Petitioner did not testify at trial.  However, at trial, Detective Atkinson testified that he

23   interviewed petitioner regarding the incident.  (Id. at 954.)  Petitioner told Detective Atkinson that

24   he did not know anything about the sexual assault being investigated.  (Id. at 957.)  Petitioner

25   stated that he had not been with a prostitute that night.  (Id. at 963.)  Petitioner denied being in the

26   room where the sexual assault occurred.  (Id. at 965.)  Petitioner's denial of any involvement in

27   the incident bolstered the credibility of the witness, whose version of events was supported by

28   other witnesses and physical evidence.

1    The evidence described above was strong evidence of petitioner's guilt.  While evidence

2    of Nurse Tilden's physical examination of the victim was evidence that the victim did not

3    consent, there was plenty of other evidence demonstrating that the victim did not consent.  The

4    outcome of the trial would not have been different had testimony regarding the results of Nurse

5    Tilden's physical examination of the victim been excluded.

6    Petitioner also argues that Nurse Schmidt's testimony regarding what the victim told

7    Nurse Tilden violated his right to confrontation.  Assuming admission of this testimony violated

8    the Confrontation Clause, the undersigned finds that its admission was harmless.  Even without

9    the testimony regarding what the victim told Nurse Tilden on the night of the incident, the

10   evidence against petitioner was strong. The outcome of the trial would not have been different

11   had this testimony not been admitted.

12   Finally, petitioner argues that his inability to cross-examine Nurse Tilden regarding any

13   pages of her report she discarded due to inconsistent statements by the victim violated the

14   Confrontation Clause.  Assuming a Confrontation Clause violation, the undersigned finds any

15   error to be harmless because the evidence against petitioner, as discussed above, was very strong.

16   It is very unlikely that the victim made statements to Nurse Tilden that would have undermined

17   the verdict in petitioner's case.  Moreover, it is reasonable to assume that Nurse Tilden would

18   have noted any statements made by the victim exonerating petitioner and his co-defendants.

19   Finally, the jury heard evidence of a number of inconsistent statements made by the victim,

20   including some made to Nurse Tilden that were inconsistent with her trial testimony.[2]  It is not

21   likely that additional evidence of other inconsistencies in statements made by the victim would

22   have changed the outcome, considering the strength of the evidence against petitioner.

23   For the reasons discussed above, the undersigned finds that the denial of this claim by the

24   California Supreme Court was not an unreasonable application of clearly established Supreme

25   Court authority.  Accordingly, this claim should be denied.

26

---

27   [2]  In his opening brief on appeal, petitioner cited several examples of the victim "repeatedly
28   changing her testimony from one questioner to the next."  (Respondent's Lodged Document 1 at
     56-57.)

1    *Cross-Examination of Victim*

2        The California Court of Appeal was the last state court to issue a reasoned decision

3    addressing this claim.  (Respondent's Lodged Documents 4 (opinion of California Court of

4    Appeal), 7 (petition for review), 8 (order by California Supreme Court denying petition for

5    review.)

6        Petitioner alleges that his rights were violated when the trial court limited his cross-

7    examination of the victim.  The California Court of Appeal denied this claim for the reasons

8    stated herein:

9            Lewis contends the court violated his constitutional rights by
10           limiting T.L.'s cross-examination with respect to a 1995
             conversation she had with an undercover officer. We find no error.

11           Lewis asked to cross-examine T.L. regarding statements she made
12           to an undercover officer in 1995 when she was soliciting
             prostitution. Codefendants joined the request. According to a
             police report, T.L. told the undercover officer, "if you are lying
13           about being an undercover officer and bust me, I'll kill you.... [I]f
             you bust me, I'll fill a condom with sperm and say it's yours to get
14           you in trouble."

15           The court ruled the evidence about T.L. "threaten[ing] to create a
             falsehood against an officer" was relevant because "your defense in
16           this case is that she's lying about being raped." The evidence about
             her threatening to kill the officer was also relevant because it
17           "obviously bears upon her credibility." The evidence about planting
             evidence was inadmissible because "the defense in this case is not
18           that she planted evidence, the defense in this case is she's lying
             about consent."
19
             In front of the jury, the defense elicited the following testimony
20           from T.L. about the 1995 incident. When asked whether she made
             the statement, "if you're lying [about not being an undercover
21           police officer] and bust me, I'll kill you," T.L. testified she made
             that statement as a joke, explaining, "I'm not going to kill a police
22           officer. You know that as well as I am [sic]. I don't have any
             murders on my jacket." When asked if she "threaten[ed] to make a
23           false claim against that officer," T.L. responded, "I wouldn't call it
             a threat. Because if it was a threat, they would have pursued it."
24
             Lewis contends this limited cross-examination restricted him from
25           showing T.L. made a "false claim regarding sexual relations " and
             therefore demonstrating "her willingness to lie about sexual
26           conduct out of vindictiveness and to serve her own purposes."
             Lewis misses the point. The court prohibited the testimony about
27           the condom because it was about planting evidence-something not
             present here. "[N]ot every restriction on a defendant's desired
28           method of cross-examination is a constitutional violation." (*People*

                                           22

1  |  v. Carpenter (1999) 21 Cal.4th 1016, 1051.) Unless the defendant
2  |  can show that the prohibited cross-examination would have produced a significantly different impression of the witness's credibility, the trial court's exercise of its discretion does not violate
3  |  the Sixth Amendment. (Carpenter, at p. 1051.) From the testimony the court allowed, the jury learned T.L. had threatened to kill a
4  |  police officer, although she claimed it was in jest, and had said she would make a false claim against a police officer, although T.L.
5  |  refused to classify it as a threat. Delving into the issue of the condom, which went to her propensity to plant evidence, would
6  |  have confused the issue, which here was T. L.'s propensity to make a false claim of rape where the defense was consent. The record
7  |  therefore does not establish the prohibited cross-examination would have produced a significantly different impression of the witness's
8  |  credibility. Therefore we find no abuse. (See Carpenter, at p. 1052.)

(Respondent's Lodged Document 4 at 19-21.)

The Sixth Amendment confrontation right includes a right to cross-examination and a right to present relevant evidence. Wood v. Alaska, 957 F.2d 1544, 1549 (9th Cir. 1992). A Confrontation Clause violation occurs when the defendant is "prohibited from engaging in otherwise appropriate cross examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986) (citation and internal quotations omitted). A violation occurs when a reasonable trier of fact "might have received a significantly different impression" of a witness' credibility if the court had not limited the cross-examination. See id. at 680.

The California Court of Appeal reasonably found that the trial court's limitation of petitioner's cross examination of the victim did not violate the Confrontation Clause. The state appellate court reasonably found that "delving into the issue" of the condom would have confused the issue. See, e.g., Van Arsdall, 475 U.S. at 679 ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."). Accordingly, this claim should be denied.

////

////

23

1  Alleged Ineffective Assistance of Trial and Appellate Counsel

2      *Legal Standard*

3      The Sixth Amendment to the United States Constitution guarantees not only assistance,

4  but effective assistance, of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The

5  purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of

6  ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the

7  adversarial process that the trial cannot be relied on as having produced a just result."  Id.  To

8  prevail on an ineffective assistance claim, a habeas petitioner must show that (1) counsel's

9  performance was "deficient," i.e., his "representation fell below an objective standard of

10  reasonableness" under prevailing professional norms, id. at 687–88, and (2) prejudice flowed

11  from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's

12  errors, the result of the proceedings would have been different, see id. at 691–94.

13      "A court considering a claim of ineffective assistance must apply a 'strong presumption'

14  that counsel's representation was within the 'wide range' of reasonable professional assistance."

15  Harrington v. Richter, 131 S.Ct. 770, 787 (2011) (quoting Strickland, 466 U.S. at 689).  The

16  standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential ... and when the two

17  apply in tandem, review is doubly so."  Id. at 788 (quotation and citations omitted).  When

18  § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question

19  is whether there is any reasonable argument that counsel satisfied Strickland's deferential

20  standard."  Id.

21      Claims of ineffective assistance of appellate counsel are reviewed according to the

22  standard set out in Strickland v. Washington, 466 U.S. 668 (1984).  Smith v. Robbins, 528 U.S.

23  259, 285 (2000).  First, the petitioner must show that counsel's performance was objectively

24  unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel

25  acted unreasonably in failing to discover and brief a merit-worthy issue.  Smith, 528 U.S. at 285;

26  Moormann v. Ryan, 628 F.3d 1102, 1106 (9th Cir. 2010).  Second, the petitioner must show

27  prejudice, which in this context means that the petitioner must demonstrate a reasonable

28  probability that, but for appellate counsel's failure to raise the issue, the petitioner would have

24

1    prevailed in his appeal.  Smith, 528 U.S. at 285–86; Moormann, 628 F.3d at 1106.

2              *Failure to Object to Closing Argument*

3         Respondent's answer does not address this claim.

4         Petitioner argues that his counsel was ineffective for failing to object to the prosecutor's

5    closing argument.   Petitioner contends that during closing argument, counsel for co-defendant

6    Snowden likened the jury's decision on a verdict to such life-altering decisions as marrying,

7    choosing a career, buying a home or undertaking a serious medical procedure.  Petitioner argues

8    that the prosecutor misstated the law in responding to this argument:

9              And then Mr. Foster says he likens your decision making to
             marriage, career, buying a house, medical procedure.   No.
10             Reasonable doubt is defined to you.  It's not – I mean those are just
             about as conservative a decision you can make in your life, you
11             know.   Who are you going to marry, okay?   That's not your
             decision here.  All right.
12
             You're gonna [sic] buy a house.   You're gonna [sic] have a
13             operation.  Those are life altering decisions.  That's not what you're
             faced with here.  Don't be fooled, okay?  We have juries up and
14             down this state every day rendering guilty verdicts based on
             reasonable doubt because it's asking you to just to [sic] reason, to
15             be reason – to be reasonable and logical.

16    (RT at 2461.)

17         Petitioner argues that in the argument quoted above, the prosecutor misrepresented the

18    reasonable doubt standard.  Petitioner argues that his counsel was ineffective in failing to object

19    to this argument.

20         The California Court of Appeal denied this claim for the reasons stated herein:

21             In responding to an argument Snowden's lawyer made regarding
             reasonable doubt, the prosecutor stated as follows:
22
             "And then [Snowden's lawyer] says he likens your decision making
23             to marriage, career, buying a house, medical procedure. No.
             Reasonable doubt is defined to you. It's not-I mean those are just
24             about as conservative a decision you can make in your life, you
             know. Who are you going to marry, okay? That's not your decision
25             here. All right?

26             "You're gonna buy a house. You're gonna have a[n] operation.
             Those are life altering decisions. That's not what you're faced with
27             here. Don't be fooled, okay? We have juries up and down this state
             every day rendering guilty verdicts based on reasonable doubt
28             because it's asking you to just to reason, to be reason-to be

                                    25

reasonable and logical."

There was no objection to this argument. On appeal, Lewis argues "the prosecutor trivialized the appropriate standard by which the defendants' actions should have been evaluated thereby decreasing the prosecution's burden of proof...."

In People v. Nguyen (1995) 40 Cal.App.4th 28, a case that bears some similarity to this, the prosecutor argued without objection the reasonable doubt standard was "'a very reachable standard that you use every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving. I won't paraphrase it because it's a very difficult instruction, but it's not an unattainable standard. It's the standard in every single criminal case.'" (Id. at p. 35.) The appellate court "strongly disapprove[d] of arguments suggesting the reasonable doubt standard is used in daily life to decide such questions as whether to change lanes or marry. The argument is improper even when the prosecutor, as here, also states the standard for reasonable doubt is 'very high' and tells the jury to read the instructions." (Id. at p. 36.)

Here, the argument was somewhat similar because the prosecutor argued the application of the reasonable doubt instruction was an "every day" decision, but he went farther in arguing the standard was not as conservative as the standard to be used when deciding whom to marry, what house to buy, etcetera. This was wrong. "As our Supreme Court stated over 120 years ago ... 'The judgment of a reasonable man in the ordinary affairs of life, however important, is influenced and controlled by the preponderance of evidence. Juries are permitted and instructed to apply the same rule to the determination of civil actions involving rights of property only. But in the decision of a criminal case involving life or liberty, something further is required.... There must be in the minds of the jury an abiding conviction, to a moral certainty, of the truth of the charge, derived from a comparison and consideration of the evidence.'" (People v. Nguyen, supra, 40 Cal.App.4th at p. 36.)

As noted, though, there was no objection to the prosecutor's argument. In this procedural posture, and where Lewis has argued counsel was ineffective, we preliminarily ask whether counsel was deficient for failing to object. (Strickland v. Washington (1984) 466 U.S. 668, 687.) Although the argument was improper, we cannot say counsel was deficient for failing to object. He may not have wanted to draw attention to the improper argument, knowing the court was going to instruct on reasonable doubt shortly and it was the instruction that controlled. Since we can conceive of this as a reasonable tactical reason for failing to object, Lewis's ineffective assistance of counsel claim fails. (People v. Wright (1990) 52 Cal.3d 367, 404-405.)

(Respondent's Lodged Document No. 4 at 28-30).

////

1      In the petition for review, petitioner did not clearly raise an ineffective assistance of

2   counsel claim based on counsel's failure to object to this closing argument.  (Respondent's

3   Lodged Document No. 7 at 64-65.)  Petitioner did not raise the instant ineffective assistance of

4   counsel claim in any of his habeas corpus petitions filed in the California Supreme Court.

5   Therefore, this claim of ineffective assistance of counsel is not exhausted.  Because this claim has

6   no merit, as will be discussed herein, the undersigned may address the merits of this claim.  See

7   28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

8   notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

9   State.").

10      The undersigned next considers the standard of review to apply when reviewing this

11   claim.  Generally, unexhausted claims are reviewed de novo because there is usually no state

12   court decision on that claim, and therefore no decision to defer to under the Anti–Terrorism and

13   Effective Death Penalty Act ("AEDPA").  See, e.g., Cassett v. Stewart, 406 F.3d 614, 623 (9th

14   Cir. 2005); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002) (federal habeas court reviews

15   unexhausted claim de novo).  However, AEDPA's deferential standard of review may apply to

16   the instant claim because the California Court of Appeal issued a reasoned opinion.  The

17   undersigned is aware of no authority providing specific guidance in this situation.  However, in

18   Edwards v. Harrington, 2011 WL 4434539 (C.D.Cal. 2011), the District Court was also faced

19   with an unexhausted claim and a reasoned state court decision addressing that claim.  The District

20   Court in Edwards v. Harrington decided that, in an abundance of caution, it would review the

21   claim de novo, "since, where a claim fails under de novo review, it must also fail under AEDPA's

22   more deferential standard."  2011 WL 4434539 at *10, citing Berghuis v. Tompkins, 130 S. Ct.

23   2250, 2265 (2010).  See also Kiser v. Gonzales, 2012 WL 6641899 at *6 (S.D.Cal. 2012)

24   (adopting reasoning of Edwards v. Harrington, supra.)

25      "Nevertheless, where the reasoning of a state court is relevant to the resolution of a

26   constitutional issue, that reasoning must be part of a federal habeas court's consideration even

27   under a de novo standard of review."  Id., citing Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir.

28   2008) (en banc).

1     In an abundance of caution, the undersigned will also conduct a de novo review of this

2  unexhausted claim, taking into consideration the reasoning of the California Court of Appeal.

3     At the outset, the undersigned finds that the at-issue argument by the prosecutor was

4  improper.  However, for the following reasons, petitioner was not prejudiced by counsel's failure

5  to object.

6     In this case, the evidence against petitioner was strong.  As discussed above, the victim's

7  testimony regarding what happened to her up to the point of the rapes, i.e., being snatched off the

8  street, taken to a hotel against her will, told to take her clothes off, was corroborated by witnesses

9  Brittany Sullivan and Stephanie Coleman.  While petitioner made a statement to the police

10 denying being with the victim or in the hotel room, his DNA was found in her body and in the

11 hotel room.  The jury was also instructed with the proper reasonable doubt standard.  (CT at 970.)

12 The jury was also instructed that closing argument was not evidence.  (Id. at 971.)  For these

13 reasons, the undersigned finds that petitioner was not prejudiced by counsel's failure to object to

14 the improper closing argument.  The outcome of petitioner's trial would not have been different

15 had counsel objected.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to

16 follow its instructions.").  Accordingly, this claim should be denied.

17          *Failure to Raise Confrontation Clause Claims*

18     Petitioner argues that his appellate counsel was ineffective for failing to raise his

19 Confrontation Clause claim on appeal.  Petitioner argues that his trial counsel was ineffective if

20 he failed to raise the Confrontation Clause claim at trial.  Petitioner states that he does not know

21 whether trial counsel raised this claim because he does not have access to the trial record.

22     In the answer, respondent argues that these claims are not exhausted because they were

23 raised in a habeas corpus petition which the California Supreme Court denied by order citing

24 People v. Duvall, supra, and People v. Swain, supra.  Petitioner raised these claims in the habeas

25 corpus petition filed in the California Supreme Court on November 1, 2011.  (Respondent's

26 Lodged Document No. 11.)  The California Supreme Court denied this habeas corpus petition

27 without comment or citation.  (Respondent's Lodged Document No. 17.)  Accordingly, these

28 claims are exhausted.  The undersigned herein conducts an independent review of the record to

1  determine whether the denial of these claims by the California Supreme Court was a reasonable

2  application of clearly established Supreme Court authority.

3      Petitioner argues that trial and appellate counsel were ineffective for failing to argue that

4  petitioner's right to confrontation was violated by the admission of Nurse Tilden's report through

5  the testimony of Nurse Schmidt.  As he did above, petitioner argues that his inability to cross-

6  examine Nurse Tilden regarding her physical examination of the victim and the victim's

7  statements to her violated the Confrontation Clause.

8      For the reasons stated herein, the undersigned finds that petitioner's counsel were not

9  ineffective for failing to raise a Confrontation Clause claim regarding Nurse Schmidt's testimony

10  addressing the results of Nurse Tilden's report and physical examination of the victim.  As

11  discussed above, strong evidence was presented that the victim had sex with petitioner and that

12  the victim did not consent.  The victim's testimony regarding the incident, up until the rapes, was

13  corroborated by witnesses Coleman and Sullivan.  Petitioner's DNA was found on the victim.

14  Petitioner's denial of involvement in the incident or of having been in the hotel room bolstered

15  the victim's testimony that she did not consent.  Assuming admission of Nurse Tilden's report

16  violated the Confrontation Clause, petitioner was not prejudiced by his counsels' failure to raise

17  this issue because there was other strong evidence against him.  In other words, the outcome of

18  the trial and his appeal would not have been different had this issue been raised.  For these

19  reasons, petitioner was not prejudiced by the failure of trial counsel or appellate counsel to raise

20  this Confrontation Clause claim.

21      Petitioner also argues that trial and appellate counsel were ineffective for failing to raise a

22  Confrontation Clause claim based on his inability to cross-examine Nurse Tilden regarding any

23  pages of her report that she destroyed due to inconsistent statements by the victim.   As discussed

24  above, petitioner's claim alleging a Confrontation Clause violation based on his inability to cross-

25  examine Nurse Tilden regarding any discarded notes is without merit.  For this reason, petitioner

26  was not prejudiced by the failure of trial or appellate counsel to raise this Confrontation Clause

27  claim.

28  ////

1    The denial of this claim by the California Supreme Court was not an unreasonable

2    application of clearly established Supreme Court authority.  Accordingly, this claim should be

3    denied.

4         *Failure to Challenge DNA Evidence*

5         Petitioner argues that in 2013, a new DNA report was issued stating that he did not

6    contribute to three of the DNA samples the prosecutor represented he contributed to at trial.

7    Petitioner argues that the 2013 report indicates that he did not contribute to the DNA sample from

8    the outside of the condom, the sperm sample from the right breast and the non-sperm sample from

9    the right breast.  (ECF No. 30 at 31.)  Respondent addressed the merits of this claim in the

10   opposition to petitioner's motion for leave to file a second amended petition.  (ECF No. 27.)

11        The 2013 report states that it was prepared based on revisions to the Interpretational

12   Guidelines and the Statistical Guidelines within the Technical Procedures of the DNA Manual.

13   (Respondent's Lodged Document 18 at 1.)  Based on these revisions, the interpretation and

14   statistical calculations for the sperm samples taken of the foreign material potential saliva swab

15   from the right breast, the sperm fraction of the swab collected from the outside of the condom, the

16   non-sperm fraction of the foreign material potential saliva swab from the right breast and the non-

17   sperm fraction of the swab from the outside of the condom changed from the 2006 report.  (Id. at

18   1.)

19        The 2006 report, relied on at trial, and the 2013 amended report, both state that petitioner

20   was the source of sperm from the vaginal and cervical swabs.  (Respondent's Lodged Documents

21   16 at 8, 18 at 9.)

22        The 2006 report states that petitioner was a potential contributor to the sperm fraction of

23   the swab taken from the right breast.  (Respondent's Lodged Document 16 at 9.)  This profile was

24   estimated to occur in 1 in 31,000 of the African American population, 1 in 210,000 of the

25   Caucasian population and 1 in 1 million of the Hispanic population.  (Id.)  The 2013 report states

26   that the partial profile of the sperm fraction of the swab taken from the right breast is consistent

27   with petitioner's profile.  (Respondent's Lodged Document 18 at 9.)  The 2013 report states that

28   this profile is estimated to occur in 1 in 5,000 of the African American population, 1 in 39,000 of

1    the Caucasian population and 1 in 180,000 of the Hispanic population.  (Id.)

2          The 2006 report states that petitioner is excluded as being a contributor to the non-sperm

3    fraction of the right breast sample.  (Respondent's Lodged Document 16 at 9.)  The 2013 report

4    states that the non-sperm fraction is inconclusive and therefore not suitable for comparison.

5    (Respondent's Lodged Document 18 at 10.)

6          Regarding the sperm fraction outside condom swab, the 2006 report states that petitioner

7    and co-defendant Carr could not be excluded as being contributors to the mixture.   (Respondent's

8    Lodged Document 16 at 10.)  The 2006 report states that this profile is estimated to occur in 1 in

9    51 million African Americans, 1 in 310 million Caucasians and 1 in 640 Hispanics.  (Id.)

10          The 2013 report states that petitioner and co-defendant Carr are included as being possible

11   contributors to the sperm fraction outside condom swab.  (Respondent's Lodged Document 18 at

12   10.)  The 2013 report states that no alleles foreign to petitioner were detected.  (Id.)  The 2013

13   report states that this profile is estimated to occur in 1 in 930 million of the African American

14   population, 1 in 6 billion of the Caucasian population and 1 in 19 billion for the Hispanic

15   population.  (Id.)

16          The non-sperm fraction condom swab was tested for the victim's DNA (Respondent's

17   Lodged Documents 16, 18) and is not relevant to the instant claim.

18          Petitioner alleges that his trial counsel was ineffective for failing to investigate and object

19   to the DNA based on the results of the 2013 report.  Petitioner argues that his appellate counsel

20   was ineffective for failing to argue that trial counsel was ineffective for failing to challenge the

21   DNA test results.  Petitioner also appears to argue that appellate counsel was ineffective for

22   failing to directly challenge the validity of the DNA evidence.

23          The undersigned first finds that petitioner's trial counsel was not ineffective for failing to

24   challenge the DNA samples on the grounds alleged.  As discussed above, the DNA samples were

25   retested in 2013 due to changes in guidelines and procedures.  It is unclear how petitioner's

26   counsel could have anticipated these changes.  Petitioner has also not demonstrated prejudice as a

27   result of trial counsel's failure to challenge the DNA.  Most importantly, the 2006 and 2013

28   reports both found that petitioner was the source of the vaginal and cervical swabs.  The results of

1    the 2013 DNA test merely changed the odds of petitioner being a source of the sperm fraction

2    outside condom swab and the sperm fraction swab of the right breast.  It is not likely that the

3    outcome of the trial would have been different had the jury been aware of the changes found in

4    the 2013 report regarding the likelihood of petitioner being the source of the sperm swabs taken

5    from the right breast and from outside the condom.  For these reasons, this claim of ineffective

6    assistance of counsel is without merit.

7         Petitioner has also not demonstrated that appellate counsel was ineffective for failing to

8    challenge the DNA evidence on appeal or for failing to raise a related ineffective assistance of

9    counsel claim.  Petitioner has not shown how appellate counsel would have known to challenge

10   the DNA evidence on the grounds alleged.  Because both the 2006 and 2013 reports found that

11   petitioner was the source of the petitioner was the source of the vaginal and cervical swabs, it is

12   not likely that the outcome of petitioner's appeal would have been different had appellate counsel

13   challenged the DNA.

14        For the reasons discussed above, the undersigned finds that these claims of ineffective

15   assistance of trial and appellate counsel are without merit.

16   Prosecutoral Misconduct

17        Based on the 2013 revised DNA report, petitioner appears to argue that the prosecutor

18   committed misconduct by introducing evidence stating that petitioner was the source of the sperm

19   samples taken from the right breast and from outside the condom.

20        In order to prevail on a prosecutorial misconduct claim premised on the alleged

21   presentation of false evidence, petitioner must establish that his conviction was obtained by the

22   use of perjured testimony that the prosecutor knew at the time to be false or later discovered to be

23   false and allowed to go uncorrected.  See Napue v. Illinois, 360 U.S. 264, 269 (1959).  Due

24   process also protects against the admission of false evidence, "whether it be by document,

25   testimony, or any other form of admissible evidence."  Hayes v. Brown, 399 F.3d 972, 981 (9th

26   Cir. 2005) (en banc).  Where false evidence is presented to the jury, the conviction will be

27   reversed where: (1) "[T]he prosecution knowingly presented false evidence or testimony at trial";

28   and (2) "it was material, that is, there is a reasonable likelihood that the false evidence or

1   testimony could have affected the judgment of the jury."  Morris v. Ylst, 447 F.3d 735, 743 (9th

2   Cir. 2006).

3       There is no evidence suggesting that the prosecutor knew that the results of the DNA tests

4   of the right breast and condom were not entirely accurate.  As discussed above, the DNA was

5   retested in 2013 due to changes in procedures.  It is also not likely that the outcome of the trial

6   would have been different had the jury been made aware of the results of the 2013 DNA tests to

7   the right breast and condom.  The results of the 2013 DNA test merely changed the odds of

8   petitioner being a source of the sperm fraction outside condom swab and the sperm fraction swab

9   of the right breast.  The evidence against petitioner was strong, including the DNA tests showing

10  petitioner to be the source of the DNA from the vaginal and cervical swabs.  For these reasons,

11  the undersigned finds that this claim of prosecutorial misconduct is without merit.

12  Actual Innocence

13      Petitioner may also possibly be raising a free-standing claim of actual innocence based on

14  the 2013 revised DNA report.

15      The Supreme Court has never decided whether a habeas petitioner may obtain relief by

16  asserting a freestanding claim of actual innocence.  In Herrera v. Collins, 506 U.S. 390, 400

17  (1993) ( "Herrera" ), the Court recognized that "[c]laims of actual innocence based on newly

18  discovered evidence have never been held to state a ground for federal habeas relief absent an

19  independent constitutional violation occurring in the underlying state proceeding."  The Herrera

20  Court assumed, without deciding, "that in a capital case a truly persuasive demonstration of

21  'actual innocence' made after trial would render the execution of a defendant unconstitutional,

22  and warrant federal relief if there were no state avenue open to process such a claim," but ruled

23  that the petitioner in that case had not made such a showing.  Id. at 417.  Thus, whether a federal

24  constitutional right to be released upon proof of "actual innocence" exists "is an open question."

25  District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 71 (2009); House v.

26  Bell, 547 U.S. 518, 554–55 (2006) (expressly declining to decide whether federal habeas courts

27  ////

28  ////

1   may entertain freestanding claims of actual innocence). [3]

2          In any event, petitioner's challenge to the DNA evidence based on the changes made in

3   the 2013 report do not support a claim of actual innocence.  The evidence against petitioner was

4   strong and both the 2006 and 2013 reports found petitioner to be the source of the DNA from the

5   vaginal and cervical swabs.  For these reasons, petitioner's claim of actual innocence is without

6   merit.

7          Accordingly, IT IS HEREBY ORDERED that:

8          1.   Petitioner's motion to stay (ECF No. 23) is denied as unneccesary;

9          2.   Petitioner's motion for leave to file a second amended petition (ECF No. 25) is denied

10              on grounds that it is superseded by his motion for leave to file a third amended

11              petition; and

12         3.   Petitioner's motion for leave to file a third amended petition ( ECF No. 29) is granted;

13         IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas

14  corpus be denied.

15         These findings and recommendations are submitted to the United States District Judge

16  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

17  after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

20  he shall also address whether a certificate of appealability should issue and, if so, why and as to

21  which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

22  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

23  2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after

24  service of the objections.  The parties are advised that failure to file objections within the

25  ───────────────
    [3] Some Ninth Circuit cases appear to recognize a freestanding habeas claim of actual innocence.
26  See e.g., Boyde v. Brown, 404 F.3d 1159, 1168 (9th Cir. 2005), amended on other grounds, 421
    F.3d 1154 (9th Cir.2005); Turner v. Calderon, 281 F.3d 851, 872–73 (9th Cir. 2002); Jackson v.
27  Calderon, 211 F.3d 1148, 1164–65 (9th Cir. 2000).

28

1   specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

2   F.2d 1153 (9th Cir. 1991).

3   Dated:  June 26, 2014

4

5   Lew2072.157

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28